# In the United States Court of Federal Claims

No. 19-1583C

(Filed:  July 27, 2020)

|  |  |
|---|---|
| HOUSING AUTHORITY OF THE CITY OF SLIDELL, <br><br> *Plaintiff,* <br><br> v. <br><br> THE UNITED STATES, <br><br> *Defendant.* | RCFC 12(b)(1); RCFC 12(b)(6); Tucker Act jurisdiction; 42 U.S.C. § 1437; Housing and Urban Development; annual contributions contract; public housing agency; breach of contract; money damages; contract damages; *Bowen v. Massachusetts*; "strings-attached" grants; judicial estoppel. |

*James M. Williams*, Chehardy, Sherman, Williams, Murray, Recile, Stakelum, & Hayes, LLP, Metairie, LA, for Plaintiff.

*Reta E. Bezak*, United States Department of Justice, Civil Division, Washington, DC, for Defendant.  With her on the briefs were *Joseph H. Hunt*, Assistant Attorney General, Civil Division, *Robert E. Kirschman, Jr.*, Director, and *Franklin E. White Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC.

## OPINION AND ORDER

**SOLOMSON, Judge.**

Plaintiff, the Housing Authority of the City of Slidell ("HACS"), filed its First Amended Complaint, ECF No. 20 ("FAC"), seeking a judgment against Defendant, the United States — acting by and through the United States Department of Housing and Urban Development ("HUD") — for its breach of an Annual Contributions Contract ("ACC").[1]  *See* FAC at 10 ("Prayer for Relief").  In particular, HACS asks for an "[a]ward

---

[1] On October 10, 2019, HACS filed its initial complaint in this Court.  ECF No. 1.  The government moved to dismiss.  ECF No. 7.  After that motion was fully briefed, *see* ECF Nos. 10, 17, and following a status conference to discuss that motion, the Court issued an Order, denying the government's motion, and granting HACS leave to file an amended complaint.  ECF No. 19.  On February 21, 2020, HACS filed its FAC.

[of] monetary damages . . . in the amount [HACS] is owed pursuant to HUD's obligations under the ACC" and "any other relief that is proper." *Id.*; *see id.* at 2 & ¶ 17.

The government moved to dismiss the FAC pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"),[2] essentially arguing that HACS's suit for money damages due to an alleged breach of the ACC is nothing more than an Administrative Procedure Act ("APA")[3] claim masquerading as a contract claim at the Tucker Act ball. In line, however, with this Court's recent decisions involving other ACCs or similar agreements with HUD,[4] this Court declines the government's invitation to dance at its jurisdictional party, unless and until a higher court says that we must. Until then, the government's latest, but by no means only, reading of applicable precedent — including that of the United States Court of Appeals for the Federal Circuit, as well as the United States Supreme Court's decision in *Bowen*

---

[2] The government's motion to dismiss the FAC has been fully briefed. *See* ECF No. 22 ("Def. Mot."); ECF No. 24 ("Pl. Resp."); ECF No. 25 ("Def. Rep."). On June 24, 2020, the Court held oral argument on the government's motion, *see* ECF No. 26, the transcript of which is cited herein as "Tr." (ECF No. 31).

[3] A district court may "set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

[4] *See, e.g., San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 452 (2019) ("*SAHA*") (holding that "plaintiff is not seeking the repayment of alleged strings-attached funds from HUD's 2012 Section 9 Operating Fund, but an award of monetary damages to be paid from the Judgment Fund, and rejecting "defendant's reliance on *Lummi, NCMS,* and *Bowen* for the proposition that plaintiff cannot recover 'unrestricted money damages' for defendant's alleged breach of [contract]")); *Boaz Hous. Auth. v. United States*, 141 Fed. Cl. 74, 83 (2018) ("Plaintiffs do not seek prospective relief or the release of funds to which they are entitled under the relevant HUD regulation. Instead, they seek an award of money damages to compensate them for losses they suffered as a result of the withholding of the operating subsidies owed to them[]. The purpose of such a monetary award would be to compensate them for the government's failure to meet a past-due obligation, not to enforce the regulatory obligation itself."); *Pub. Hous. Authorities Directors Ass'n v. United States*, 130 Fed. Cl. 522, 536 (2017) ("*PHADA*") (holding that "[HUD] breached its obligations under the ACCs when it applied the operating expense offset in response to the 2012 Appropriations Act, rather than the pro rata reduction rule prescribed by Title 24[,]" and thus implicitly establishing this Court's jurisdiction over breach of ACC claims); *cf. Hous. Auth. of City of New Haven v. United States*, 140 Fed. Cl. 773, 787 (2018) (holding that plaintiffs "breach-of-contract claim is not merely a disguised equitable claim because, in the context of this case, an order of specific performance . . . or an injunction . . . would be equivalent to an order requiring the payment of funds owed to plaintiffs"); *Hous. Auth. of the Cty. of Santa Clara v. United States*, 125 Fed. Cl. 557, 562 (2016) (holding that the Court of Federal Claims has jurisdiction to adjudicate breach of contract claims against HUD for "fail[ing] to provide . . . [funds] to which Plaintiffs [were] entitled").

*v. Massachusetts*[5] — strikes this Court as an epic overreach that, if followed, would make a mess of the dividing line between the Tucker Act and the APA.

For the reasons explained below, HACS's claims deserve to be heard on the merits, and thus the government's motion is **DENIED**.

## I.       Factual and Legal Background[6]

HACS is a public housing agency ("PHA")[7] — a "governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing." FAC at 2–3 (citing 42 U.S.C. § 1437a(b)(6)(A)); *see also* 24 C.F.R. § 905.108 ("Any state, county, municipality, or other governmental entity or public body or agency or instrumentality of these entities that is authorized to engage or assist in the development or operation of public housing under this part."). HACS entered into an ACC with HUD, "by executing a Form HUD-53012, bearing number FW-1128" (the "HACS ACC"). FAC ¶ 3.[8]

---

[5] 487 U.S. 879 (1988).

[6] This section does not constitute factual findings by the Court. Rather, this Court assumes, as it must, that the factual allegations contained in the FAC are true for the purposes of resolving the pending motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[F]or the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true." (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))). The Court also has considered "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)). RCFC 9(k) provides: "In pleading a claim founded on a contract or treaty, a party must identify the substantive provisions of the contract or treaty on which the party relies. In lieu of a description, the party may annex to the complaint a copy of the contract or treaty, indicating the relevant provisions." The Court may rely on an annexed copy of the contract in deciding a motion to dismiss. *See Terry v. United States*, 103 Fed. Cl. 645, 647 n.1 (2012) (relying on "an exhibit appended to defendant's motion containing plaintiff's concession contract"); *see also* Def. Mot. at 1 n.1.

[7] While "[t]he relevant statutes and regulations generally refer to 'public housing agencies' rather than 'public housing authorities[,]'" that "distinction is purely semantic." *Weeks v. United States*, 144 Fed. Cl. 34, 36 n.2 (2019).

[8] The FAC included Part A of the HACS ACC as Exhibit 1. *See* ECF No. 20-1 (HACS ACC, Part A, pages 1-5), ECF No. 20-2 (HACS ACC, Part A, pages 6-12). The government concurs that Exhibit 1 of the FAC, indeed, is Part A of the HACS ACC. *Cf.* ECF No. 28 at 1. Although the FAC indicates that the parties first executed the HACS ACC in 1984, *see* FAC ¶ 3, Part A of the HACS ACC attached to the FAC is dated March 5, 1996. The discrepancy does not appear material to HACS's claims or the government's motion to dismiss.

### A.  The HACS ACC

An ACC "is a contract prescribed by HUD for loans and contributions, which may be in the form of [an] operating subsidy, whereby HUD agrees to provide financial assistance and the PHA agrees to comply with HUD requirements for the development and operation of its public housing projects."  24 C.F.R. § 900.115 (quoted in FAC ¶ 2). The HACS ACC itself defines "ACC" as "the "Consolidated Annual Contributions Contract between HUD and [HACS], . . . consisting of Part A (which sets forth requirements applicable to all projects) and Part B (which sets forth additional requirements that apply only to certain types of projects)."  ECF No. 20-1 at 2 (HACS ACC, Part A, § 2 ("Definitions")).[9]  In referring to itself as a "Contract," the HACS ACC explicitly distinguishes between such an instrument and a "Cooperation Agreement," a term which the HACS ACC separately defines.  *Id.*

The HACS ACC "incorporates by reference . . . those regulations issued by HUD *for the development, modernization, and operation* of public and Indian housing projects contained in Title 24 of the Code of Federal Regulations, as said Title shall be amended from time to time."  ECF No. 20-1 at 2 (HACS ACC, Part A, at 1) (emphasis added).[10] Moreover, pursuant to that agreement, "[n]othing herein shall release [HACS] from compliance with all applicable laws, executive orders, and regulations that are not specifically incorporated herein by reference."  *Id.*

The government's contractual obligations, pursuant to the HACS ACC, include the following:

> HUD shall provide maximum responsibility and flexibility to [P]HAs in making administrative decisions within all applicable statutes, executive orders, regulations and this ACC.  HUD *shall provide annual contributions* to the [P]HA in

---

[9] In response to the Court's June 19, 2020 Order, ECF No. 27, each party separately filed Part B of the HACS ACC. *See* ECF Nos. 28, 29.

[10] The parties do not address in any detail the extent of the effect of this incorporation language, or, in particular, whether "the development, modernization, and operation" phrase serves a limiting function on any such incorporation.  *See also* HACS ACC, Part A, § 5 (providing that "[HACS] shall *develop and operate* all projects covered by this ACC in compliance with all the provisions of this ACC and all applicable statutes, executive orders, and regulations issued by HUD, as they shall be amended from time to time, including but not limited to those regulations promulgated by HUD at Title 24 of the Code of Federal Regulations, which are hereby incorporated into this ACC by reference as if fully set forth herein, and as such regulations shall be amended from time to time" (emphasis added)).

> accordance with all applicable statutes, executive orders, regulations, and this ACC.

FAC ¶ 5 (quoting HACS ACC § 3) (emphasis added).

HUD's promised "contributions" are comprised of "operating" subsidies and "capital" funds.[11]  With respect to operating subsidies, HACS must prepare, submit, and obtain approval of an operating budget.  ECF No. 20-1 at 6 (HACS ACC, Part A, § 11(A) ("Operating Budget")).  With respect to any particular "Federal fiscal year[,]" HUD "shall not . . . approve any estimate or revision of [HACS's] operating budget in an amount which, together with the amount of all operating subsidies then contracted for by HUD, would exceed the amount as determined by HUD of contracting authorization for operating subsidies under the Act."  HACS ACC, Part A, § 11(C).  In that regard, "HUD shall not be obligated to make any payments on account of operating subsidies in an amount in excess of the amount specifically approved by HUD."  *Id.*; *see id.* § 11(D) ("[HACS] shall not incur any operating expenditures except pursuant to an approved operating budget.").

Pursuant to the HACS ACC, HACS "must maintain complete and accurate books of account for the projects of [the housing authority] in such a manner as to permit the preparation of statements and reports in accordance with HUD requirements, and to permit timely and effective audit."  ECF No. 20-2 at 2 (HACS ACC, Part A, § 15(A) ("Books of Account, Records, and Government Access")).  Moreover, HACS "must furnish HUD such financial and project reports, records, statements, and documents at such times, in such form, and accompanied by such reporting data as required by HUD."  HACS ACC, Part A, § 15(B).[12]

### B.  HACS's Claims

In January 2016, a computer crash wiped out the entirety of HACS's accounting program.  FAC ¶ 8.  HACS informed HUD of the crash and of the fact that HACS had to

---

[11] Congress established two sources of funds to accomplish its public housing objectives:  the Capital Fund and the Operating Fund.  42 U.S.C. § 1437g(c)(1).  The purpose of the Capital Fund is to "mak[e] assistance available to public housing [authorities] to carry out capital and management activities."  *Id.* § 1437g(d)(1).  The purpose of the Operating Fund is to "mak[e] assistance available to public housing [authorities] for the operation and management of public housing."  *Id.* § 1437g(e)(1).  "Each public housing authority that manages a project receives, in addition to rents from tenants, operating subsidies from HUD pursuant to an '[a]nnual contributions contract' in which the public housing authority 'agrees to comply with HUD requirements for the development and operation of its public housing projects.'"  *Weeks*, 144 Fed. Cl. at 36–37 (quoting 24 C.F.R. § 990.115).

[12] Notably, the government nowhere invokes HACS ACC § 15.

"reconstruct[] all of its financial records."  *Id.*  Following a 2017 HUD review, *see id.* at 1, HACS received a Public Housing Assessment System ("PHAS")[13] rating of 52 out of 100.  *Id.* ¶ 9.  As a result, HACS was placed on the so-called "Troubled" list.  *Id.*

In August 2017, HUD's New Orleans Field Office informed HACS that it was being placed on what the agency has termed a "zero-dollar threshold" restriction, beginning August 27, 2017.  FAC ¶ 10.  The result of that restriction was that HACS could not draw its operating or capital funds through the Line of Credit Control System ("LOCCS")[14] "unless HUD's unreasonable and burdensome demands were met."  *Id.*  The zero-dollar threshold prohibits HACS from using any ACC funds absent HUD's prior approval.  *Id.*  According to HACS, HUD's prevention of "access to funds earned" had the effect of "imposing a cash management system on Plaintiff which severely undermined its efficiency and operation."  *Id.*

Around that same time, HACS successfully appealed its PHAS score and, on September 20, 2017, was removed from "Troubled" status.  FAC ¶ 9.  Indeed, in September 2017, HUD issued HACS a PHAS score of 81; in July 2018, HACS earned a score of 86 (both scores were out of a possible 100 points).  *Id.* ¶ 11.  HACS's status thus moved from "Troubled" to "Small PHA Deregulation" to "Standard" status within a timeframe of less than a year.  *Id.* ¶¶ 9, 11.

Nevertheless, "HUD refuses to acknowledge the updated PHAS score" and instead "continues to burden HACS with the burden of 'zero-dollar threshold' status." FAC ¶ 12.  While "HACS continues to submit its request for operating funds to HUD," and while HUD continues to approve such requests and "deposits these operating funds into HACS's . . . account," HUD's "New Orleans Field and Regional HUD offices refuse to release these funds to HACS with no basis for doing so."  *Id.* ¶ 13.  HACS alleges that "[t]hese actions constitute a breach of the ACC."  *Id.*  In that regard, HACS "has relied on [the] contractual language" in the HACS ACC, § 3 — *i.e.*, HUD's commitment in the ACC to "provide annual contributions" — and "yearly funding provided by HUD to HACS pursuant to its obligations under the ACC, in order to keep [HACS's] operations running and to provide adequate housing for the residents of Slidell."  FAC ¶ 6.

---

[13] 24 C.F.R. § 905.108 ("Definitions") ("*Public Housing Assessment System (PHAS).* The assessment system under 24 CFR part 902 for measuring the properties and PHA management performance in essential housing operations, including rewards for high performers and consequences for poor performers.").

[14] 24 C.F.R. § 905.108 ("Definitions") ("LOCCS is a HUD grant disbursement system.  LOCCS currently provides disbursement controls for over 100 HUD grant programs.").

In addition, HACS alleges that HUD has breached the ACC because despite HACS's conforming its requests for funds "with the requirements of the zero-dollar threshold[,] . . . these requests are often denied without plausible reasons."  FAC ¶ 14. HACS alleges that it has suffered damages insofar as "[t]hese requests are extremely time consuming as well as costly in time and funds as they must comply with [particular] [r]equirements for each . . . invoice along with extensive documentation no matter how small or repetitive the invoice may be."  *Id.*  HUD also "prohibited HACS from hiring a staff accountant to aid plaintiff in this burdensome process."  *Id.*

HACS further alleges that it has been the subject of an unreasonable number of "costly" and "unduly burdensome" audits — as well as a "bureaucratic nightmare which HUD is imposing" — all of which have "reduced [HACS's] ability to oversee its day-to-day operations."  FAC ¶¶ 15–16 ("The unnecessary and burdensome requirements which have been placed upon HACS only serve to impede HACS' ability to provide the necessary and important services which it renders to its tenants.").  In effect, and although "HUD is obligated to fund HACS pursuant to the ACC[,] . . . HUD has not provided the mandatory funding to HACS in over two years."  FAC ¶¶ 18–20.

HACS further asserts that HUD's rejection of HACS's requests for the release of funding is "arbitrary and capricious" which "constitute[s] a breach of contract and HACS is entitled to money damages."  FAC ¶ 21.  Relatedly, HACS claims that HUD's alleged conduct also violates the "duty of good faith and fair dealing . . . inherent in every contract."  *Id.* ¶ 22; *see also id.* ¶¶ 23–26.  HACS accordingly requests a judgment against the United States "for damages requested herein, including but not limited to, judgment as follows:"

> (a)   Find that HUD breached the Annual Contributions Contract;
>
> (b)   Find that HUD acted in an arbitrary and capricious manner towards HACS;
>
> (c)   Award monetary damages to HACS in the amount it is owed pursuant to HUD's obligations under the ACC;
>
> (d)   Award Plaintiff the costs and expenses of this Action, including attorney fees pursuant to 28 U.S.C. § 2412; and
>
> (e)   Award the Plaintiff any other relief that is proper.

FAC at 10 ("Prayer for Relief").  HACS seeks at least $1,700,000 in damages.  *Id.* ¶ 17; *see* Tr. 6:19-23.

## II.     Standard Of Review

The government moves to dismiss the FAC pursuant to RCFC 12(b)(1) and RCFC 12(b)(6) for, respectively, lack of jurisdiction and failure to state a claim upon which relief can be granted as a matter of law.

In this case, the government's jurisdictional challenge is clearly a facial attack. A facial jurisdictional attack "challenges whether the court's subject-matter jurisdiction was properly pleaded." Steven S. Gensler & Lumen N. Mulligan, 1 *Federal Rules of Civil Procedure, Rules and Commentary, Rule 12* (Feb. 2020 Update) [hereinafter *Federal Rules & Commentary*]; *see also Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1355 (Fed. Cir. 2018) (addressing "facial challenge"). A facial attack itself can take two forms. A defendant either can "assert that the plaintiff has failed to plead jurisdiction as required by Rule 8(a)(1)" or "assert that, while properly pleaded per Rule 8(a)(1), the allegations — even when assumed to be true — fail to establish jurisdiction under the relevant statute or constitutional provision." *Federal Rules & Commentary*. Regarding facial attacks, the Federal Circuit has explained:

> [W]e join the majority of our sister circuits in holding that the Supreme Court's "plausibility" requirement for facial challenges to claims under Rule 12(b)(6), as set out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009), also applies to facial challenges to subject-matter jurisdiction under Rule 12(b)(1).

*Crow Creek Sioux Tribe*, 900 F.3d at 1354–55. Thus, "[t]hreadbare recitals of [claim] elements . . ., supported by mere conclusory statements, do not suffice" to confer jurisdiction. *Id.* (quoting *Iqbal*, 556 U.S. at 678).

When considering a facial jurisdictional attack or a motion to dismiss a complaint for failure to state a claim upon which relief may be granted pursuant to RCFC 12(b)(6), the Court accepts as true all *factual* allegations — but not legal conclusions — contained in a plaintiff's complaint. *See Twombly*, 550 U.S. at 555. For a plaintiff's complaint to survive a motion to dismiss, the Court — viewing the facts in the light most favorable to the plaintiff — must conclude that "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the facts alleged] is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (citations and internal quotation marks omitted); *Chapman Law Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934, 938 (Fed. Cir. 2007) (noting that the Court's duty is

not to determine "whether the claimant will ultimately prevail" when ruling on a 12(b)(6) motion to dismiss).  On the other hand, a plaintiff may not simply plead "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citations omitted).[15]

### III.   HACS States Claims For Breach Of Contract And The Implied Duty Of Good Faith And Fair Dealing, Both Of Which Are Within This Court's Tucker Act Jurisdiction

The government's central thesis is that HACS's contract claim is actually an APA claim for specific performance of the government's obligations pursuant to the HACS ACC — in this case, for HUD to pay HACS the funds to which it claims entitlement.  To be clear, the government *agrees* that the HACS ACC *generally* may support a Tucker Act claim for breach of contract.  Def. Rep. at 3 n.1.  Thus, the government does ***not*** contend that the HACS ACC is somehow similar to a plea bargain, certain settlement agreements, or other agreements which this Court and the Federal Circuit have held do not support contract claims within our Tucker Act jurisdiction.[16]  Relying upon the United States Supreme Court's decision in *Bowen* as well as various Federal Circuit decisions,[17] the government argues that HACS's claims for amounts owed pursuant to the terms of the HACS ACC belong in district court, while claims for consequential damages (*e.g.*, lost profits) belong in *this* Court.  *See* Def. Mot. at 18 ("If HACS had alleged and sued for consequential damages caused by the alleged withholding of

---

[15] "Pursuant to RCFC 12(c), the trial court may convert a motion to dismiss into a motion for summary judgment under RCFC 56 if it relies on evidence outside the pleadings."  *Brubaker Amusement Co. v. United States*, 304 F.3d 1349, 1355 (Fed. Cir. 2002).  "Whether to accept extra-pleading matter on a motion for judgment on the pleadings and to treat the motion as one for summary judgment is within the trial court's discretion."  *Easter v. United States*, 575 F.3d 1332, 1335 (Fed. Cir. 2009) (discussing RCFC 12(b)(6)).  Neither party challenges the Court's consideration of the documents the parties filed along with their respective briefs; and, neither party suggests the dismissal motion should be treated as one for summary judgment.

[16] *See, e.g., Hymas v. United States*, 810 F.3d 1312 (Fed. Cir. 2016) (holding that co-operative farming agreements are not contracts for Tucker Act purposes); *Cunningham v. United States*, 748 F.3d 1172, 1176 (Fed. Cir. 2014) ("[T]he alleged breach of a settlement agreement does not necessarily give rise to Tucker Act jurisdiction."); *Sanders v. United States*, 252 F.3d 1329, 1336 (Fed. Cir. 2001) (holding that criminal plea agreement was not within this Court's subject-matter jurisdiction); *Marchena v. United States*, 128 Fed. Cl. 326, 332 (2016) (holding that witness protection agreements are not contracts for the purpose of establishing this Court's subject-matter jurisdiction), *aff'd,* 702 F. App'x 988 (Fed. Cir. 2017).

[17] *Lummi Tribe of the Lummi Reservation, Washington v. United States*, 870 F.3d 1313, 1318-19 (Fed. Cir. 2017), *San Juan City College v. United States*, 391 F.3d 1357 (Fed. Cir. 2004), and *Nat'l Ctr. for Mfg. Sciences v. United States*, 114 F.3d 196 (Fed. Cir. 1997) ("*NCMS*").

Section 9 assistance, there would be Tucker Act jurisdiction over such a claim.  But, HACS has instead sued for the allegedly withheld Section 9 assistance itself (the *res*), so there is no jurisdiction over this suit.").  Because such a distinction finds no support in the Tucker Act's language or the case law applying it, the undersigned joins the other members of this Court who have rejected (explicitly or implicitly) the government's argument.  *See SAHA*, 143 Fed. Cl. at 452; *Boaz*, 141 Fed. Cl. at 83; *PHADA*, 130 Fed. Cl. at 536.  Indeed, the government's position, if adopted, would create a sort of Tucker Act Bizarro World[18] in which some contract claims for money must be decided in district court and others in the Court of Federal Claims.  That is *not* what Congress codified in the Tucker Act or the APA, what the Supreme Court instructed in *Bowen*, how the Federal Circuit has approached these issues, or what the government itself argued to the United States Court of Appeals for the Seventh Circuit and the district courts.

### A.    The FAC Contains Allegations Amounting To A Prima Facie Claim For Breach Of Contract Pursuant To The Tucker Act

An examination of HACS's allegations in the context of the HACS ACC demonstrates unequivocal claims for money damages arising from a breach of contract and the implied duty of good faith and fair dealing.  Such claims, of course, fit squarely within this Court's Tucker Act jurisdiction.  We begin with the Tucker Act's plain language:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon *any claim* against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or *upon any express or implied contract with the United States* or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (emphasis added).  Accordingly, "[t]he Tucker Act statutorily waives the Government's sovereign immunity for a plaintiff's substantive common law contract claims and claims under the Contract Disputes Act[.]"  *DMS Imaging, Inc. v. United States*, 123 Fed. Cl. 645, 661 (2015) (citing 41 U.S.C. § 7101 *et seq.* and *United States v. Mitchell*, 463 U.S. 206, 212 (1983)).[19]  Neither party contends that the HACS ACC is

---

[18] https://en.wikipedia.org/wiki/Bizarro_World.

[19] Matthew H. Solomson, *Court of Federal Claims: Jurisdiction, Practice, and* Procedure (2016), at 6-1 – 6-2 ("Contract claims against the United States may be subdivided further into two groups.  The first consists of those claims over which the Court of Federal Claims (COFC) possesses jurisdiction pursuant to 28 U.S.C. § 1491(a)(1).  The second are those claims covered by the

covered by the Contract Disputes Act as a government procurement of goods or services. *Marquardt Co. v. United States*, 95 Fed. Cl. 14, 19 (2010).

The only question for purposes of jurisdiction, then, is whether HACS alleges a breach of contract claim founded upon an express or implied-in-fact contract with the government.[20]  The Court answers that question in the affirmative and holds that HACS's claims easily fit within this Court's Tucker Act jurisdiction.  The government's creative attempt to avoid the FAC with a quick dismissal finds no support in the Tucker Act's language, the ACC, or the case law.

Beginning with the Tucker Act itself, the government does not dispute that the HACS ACC constitutes a contract with the United States.  Def. Rep. at 3 ("[W]e do not argue that the ACC is not a contract.").  Nor does the government dispute that the HACS ACC generally may support a Tucker Act claim for breach of contract.  Def. Rep. at 3 n.1.  That is hardly surprising, given the parties' agreement regarding the documents that constitute the HACS ACC at issue.  ECF Nos. 20-1, 20-2 (constituting Part A of the HACS ACC); ECF Nos. 28, 29 (constituting Part B of the HACS ACC).  Moreover, HUD's own regulations define "Annual contributions contract (ACC)" as a "*contract* prescribed by HUD for loans and contributions, which may be in the form of *operating subsidy*, whereby *HUD agrees to provide financial assistance* and the PHA agrees to comply with HUD requirements for the development and operation of its public housing projects."  24 C.F.R. § 990.115 (emphasis added); *see also id.* § 883.302 (defining an ACC as "[t]he contract between the State Agency and HUD under which HUD *commits to provide the Agency with the funds* needed to make housing assistance payments to the Owner *and to pay* the Agency for administrative fees in cases where it is eligible for them" (emphasis added)).  The government's primary contractual duty pursuant to the HACS ACC clearly is to pay money,[21] and that duty is reflected in the plain terms of

---

Contract Disputes Act (CDA), actionable before this Court pursuant to 28 U.S.C. § 1491(a)(2).  The first group of contract claims are often referred to as 'non-CDA' claims or simply 'Tucker Act contract' claims.  The latter group of contract claims are 'CDA claims.'" (footnotes omitted)).

[20] *Common non-CDA Tucker Act contract claims*, Government Contract Disputes § 13:8 (2019 ed.) (noting that "[w]hile the majority of contract claims at the COFC involve CDA-covered contracts, the court also hears claims relating to non-CDA contracts[,]" and explaining that "whereas the CDA is limited to procurement contracts involving goods or services[,] . . . [f]or non-CDA contract claims, the Tucker Act provides the exclusive basis for judicial review").

[21] In the government's motion to dismiss, the government argues that the HACS ACC "falls within the . . . category of a contract that contemplates purely non-monetary relief for the claim alleged."  Def. Mot. at 26.  The government then categorically retracts that argument in its reply brief.  Def. Rep. at 3 n.1 ("Nor do we argue that the ACC does not contemplate money damages under any scenario.  Rather, . . . the remedy that HACS seeks here is simply *not* money damages – it is specific performance of the ACC . . . .  Thus, although HACS mischaracterizes the Federal

the parties' contract.  For example, the HACS ACC contains several mutual promises by both parties, not the least of which is that "HUD *shall* provide annual contributions to the [housing agency] in accordance with all applicable statutes, executive orders, regulations, and this ACC."  ECF No. 20-1 at  at 2 (HACS ACC, Part A, § 3) (emphasis added); *see Statesman II Apartments, Inc. v. United States*, 66 Fed. Cl. 608, 616–17 (2005) (quoting *Black's Law Dictionary* 1233 (5th ed. 1979) ("[T]he term 'shall' is a word of command, and one which has always or which must be given a compulsory meaning; as denoting obligation. . . . It has the invariable significance of excluding the idea of discretion.")).[22]  HACS, in exchange, promised that it "shall develop and operate all projects by this ACC in compliance with all of the provisions of this ACC and all applicable statutes, executive orders, and regulations issued by HUD[.]"  HACS ACC, Part A, § 5.

In sum, the FAC clearly alleges a contract with the government.  In turn, the government does not contest that the HACS ACC is a classic express contract, consisting of an offer, acceptance, consideration, and a meeting of the minds — all contained in a written document executed by a HUD official with the authority to bind the government.  *See Total Med. Mgmt., Inc. v. United States*, 104 F.3d 1314, 1319 (Fed. Cir. 1997) ("The requirements for a valid contract with the United States are: a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract."); *Cty. of Suffolk, N.Y., v. United States*, 19 Cl. Ct. 295, 296 (1990) (holding "grant agreements would appear to satisfy all of the traditional requirements for an enforceable contract—an offer, an acceptance, and consideration passing between the parties").

The elements of a breach of contract claim similarly are straightforward and met here:  "(1) the existence of a valid contract between the parties; (2) an obligation or duty

---

Circuit's precedent regarding the types of contracts that do not contemplate money damages, *such argument is not relevant here.*" (emphasis added in latter sentence)).

[22] There are other indications in the plain language of the HACS ACC that the government promised to pay HACS.  *See, e.g.*, HACS ACC, Part A, § 11(A) ("HUD *shall* review the [operating subsidy] calculation and, if correct, and subject to the availability of funds, take action within 45 days of submission to obligate the funds and approve a payment schedule, unless the [P]HA is notified that it must submit an operating budget as provided in (B) below."); *id.* at § 11(C) ("HUD shall not be obligated to make any payments on account of operating subsidies in an amount in excess of the amount specifically approved by HUD."); *id.* § 11(D) ("The [P]HA shall not incur any operating expenditures except pursuant to an approved operating budget."); *id.* § 23 ("[N]one of the provisions of this ACC may be modified or amended so as to impair in any way *HUD's obligation to pay any annual contributions* that have been pledged as security for any obligations of the HA." (emphasis added)).

arising from that contract; (3) a breach of that duty; and (4) damages caused by that breach." *United Launch Servs., LLC v. United States*, 139 Fed. Cl. 664, 681 (2018) (citing *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989)). As noted above, the government does not dispute the existence of a Tucker Act contract, *see* Def. Rep. at 3 n.1, and, in any event, the FAC and the documents filed with the Court clearly establish that the HACS ACC is a government contract. *See* ECF Nos. 20-1, 20-2, 28-1, 29-1.  The FAC also contains allegations that, if proven — and which the Court assumes to be true at this stage — establish a breach of the government's contractual duties.

HACS's breach syllogism is not complicated:  (1) HUD was obligated to pay certain sums (amounting to more than $1.7M) to HACS pursuant to the terms of the HACS ACC at issue; (2) HUD did not pay HACS those funds when due; and (3) "[b]y failing to provide funding to HACS under the ACC, HUD has breached its contract with HACS and is thus liable for monetary damages to HACS."  FAC at 2 ("HUD is withholding over $1,700,000.00 which it owes to the Plaintiff in accordance with the terms of the [ACC].");  *id.* ¶ 20 ("Although HUD is obligated to provide annual contributions to HACS under the ACC, it has failed to do so in over two years.").[23]

The failure to pay money when due and owing is a paradigmatic breach of contract claim.  *Westlands Water Dist. v. United States*, 109 Fed. Cl. 177, 193 (2013) ("A contract is breached when a party fails to perform a contractual duty when it is due."). Indeed, for the purposes of claim accrual, the Federal Circuit has held that "'where a claim is based upon a contractual obligation of the Government to pay money, the claim first accrues on the date when the payment becomes due and is wrongfully withheld in breach of the contract.'"  *Worthington v. United States*, 53 F. App'x 77, 81 (Fed. Cir. 2002) (quoting *Oceanic S.S. Co. v. United States*, 165 Ct. Cl. 217, 225 (1964), and noting that "each time the Government failed to pay constituted a new breach of its preexisting duty under the contract giving rise to a new claim"); *see also N. Helex Co. v. United States*, 455 F.2d 546, 550 (Ct. Cl. 1972) ("The Government's failure to pay a large amount over an extended period of time was a conceded breach of its contractual obligation. . . . Perhaps mere delay in payment, for a while, would not be a material breach but there is a clear distinction between delay of that kind and a total failure to pay over many

---

[23] HACS explicitly alleges "breach of contract and that HACS is entitled to money damages." FAC ¶¶ 21, 25–26.  In that regard, HACS's "Prayer for Relief" seeks "damages requested herein, including but not limited to [a] judgment . . . [a]ward[ing] monetary damages to HACS in the amount it is owed pursuant HUD's obligations under the ACC[.]"  FAC  at 10.

months.  Our jurisprudence strongly suggests that the latter sort of breach by the Government is material, just as it would be in the case of a private party."); *Beggs v. Bismarck Phoenix Equip., Inc.*, 2006 WL 42355, at *4 (D.N.D. Jan. 5, 2006) ("The Plaintiffs have set forth a classic case of breach of contract for failure to pay.").

Assuming the government is correct that any contract sums owed to HACS normally would come "with strings," that issue goes to the appropriate measure of damages, not to whether this Court possesses jurisdiction over HACS's claims at all. *Englewood Terrace Ltd. P'ship v. United States*, 479 F. App'x 969, 972–73 (Fed. Cir. 2012) ("The Claims Court erred by failing to deduct costs and expenses Englewood saved, i.e., did not pay, as a result of the breach.  An award of gross revenues is not appropriate; this is not the measure of Englewood's loss from HUD's breach.  By failing to deduct avoided costs, the Claims Court placed Englewood in a better position than it would have been in had there been no breach.").  In that regard, "a non-breaching plaintiff bears the burden of persuasion to establish both the costs that it incurred and the costs that it avoided as a result of a breach of contract."  *Bos. Edison Co. v. United States,* 658 F.3d 1361, 1369 (Fed. Cir. 2011) (citing *S. Nuclear Operating Co. v. United States,* 637 F.3d 1297, 1304 (Fed. Cir. 2011)).  Another possibility — one that the government fails to address — is simply that HACS may obtain damages for partial breach, but its obligations (*i.e.*, the putative "strings") continue unabated such that any of HUD's rights and remedies to control HACS's spending and performance remain unimpeded. *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1552 (Fed. Cir. 1992) ("If only a severable portion of a contract was breached, the non-breaching party can recover damages for that portion of the contract, but its remaining contractual duties are not discharged.").[24]

---

[24] In other words, "assuming the government's actions in this case have amounted to a material breach of the parties' contract, plaintiff would have the choice 'between cancelling the contract and continuing it.'  In such a situation, '[i]f [plaintiff] decides to close the contract and so conducts [it]self, both parties are relieved of their further obligations . . . ,' [ ] and plaintiff may sue for total breach.  On the other hand, '[i]f [plaintiff] elects . . . to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.'"  *Pac. Gas & Elec. Co. v. United States*, 70 Fed. Cl. 766, 771 (2006) (some alterations in original) (internal citations omitted) (quoting *Cities Serv. Helex, Inc. v. United States*, 543 F.2d 1306, 1313 (Ct. Cl. 1976)); *see also Emerald Investments Ltd. P'ship v. Allmerica Fin. Life Ins. & Annuity Co.*, 516 F.3d 612, 618 (7th Cir. 2008) ("If a party to a contract breaks it, the other party can abandon the contract . . . and sue for damages, or it can continue with the contract and sue for damages . . . . But if it makes the latter election, it is bound to the obligations that the contract imposes on it.").  Thus, even if a "PHA's right to keep the funding depends on its compliance with Federal requirements[,]" Def. Mot. at 7, the government fails to explain how a money judgment in favor of HACS would preclude HUD from enforcing its regulatory requirements or requiring HACS to fulfill its contractual obligations.

### B.  The Government Fails To Cite Any Precedent That Precludes Tucker Act Jurisdiction In This Case

Any practitioner familiar with the Tucker Act at this point might be wondering what possible basis exists for the government to challenge this Court's jurisdiction to decide HACS's claims.  The unvarnished truth is that, even after considering the government's explanations offered during oral argument, the Court still struggles to track the government's jurisdictional contentions.

The most succinct explanation of the government's position regarding jurisdiction is contained in this concession in the government's reply brief:

> [W]e do *not* argue that the ACC is not a contract. . . .
>
> Nor do we argue that the ACC does not contemplate money damages under any scenario.  Rather, as we have repeatedly stated, the *remedy* that HACS seeks here is simply *not* money damages – it is specific performance of the ACC; namely, release of the strings-attached funds to which HAC claims entitlement.

Def. Rep. at 3 & n.1 (emphasis added).

The government also asserts that "Tucker Act jurisdiction does not extend to claims for strings-attached grants."  Def. Rep. at 3.  Yet, the government does not even attempt to reconcile those various statements, and instead glosses over the fact that HACS plainly does *not* seek injunctive relief, pursuant to 28 U.S.C. § 1491(b), for the award of a grant agreement (or anything else).

The government cites not a single case from *any* court involving a category of claims based on contracts, characterized as "strings-attached" grants, that are outside the Tucker Act's ambit.  The government asserts that a "PHA's receipt of Section 9 funding is highly contingent, restricted, and subject to HUD's ongoing supervision and right to claw back the funds[.]"  Def. Mot. at 5.  That assertion, however – even if true – is just another way of saying that the government has contractual rights or regulatory

powers.[25] or that HACS has contractual obligations, too.[26]  Moreover, the government never explains what the "highly contingent" nature of the funds at issue has to do with Tucker Act jurisdiction. Def. Mot. at 3.  As this Court has noted in a different context, "[m]oney is fungible. . . . The dispositive question is not on what the money was spent, but on what basis [the recipient] qualified to receive the funds in the first place." *Mack, as Legal Representative of Mack v. Sec'y of Dep't of Health & Human Servs.*, 1995 WL 507581, at *3 (Fed. Cl. Aug. 11, 1995).[27]  Furthermore, given that HACS's claims relate to funds allocated to HACS and allegedly due to be paid under the HACS ACC *in the past*, *see* FAC at 10, the government never explains with any specificity *how* those funds have strings attached.

For example, HACS alleges that HUD "prevent[ed] HACS's access *to funds earned*[.]"  FAC ¶ 10; *see also id.* ¶ 13.  Assuming that is correct — and that HACS ultimately proves it already has earned funds which the government improperly refused to pay in violation of the HACS ACC — the government cannot avoid liability

---

[25] *See* Def. Mot at 7 (noting that "[i]n the event of noncompliance by a PHA, HUD has numerous available remedies").  The government does not explain how its "numerous available remedies" in the event of HACS's noncompliance would be rendered impotent by a money judgment, assuming HACS demonstrates its entitlement to one; nor does the government explain how the existence of such remedies translates to this Court's lacking Tucker Act jurisdiction here.  The government asserts that "a PHA's right to keep [its] funding depends on its compliance with Federal requirements." *Id.*  Assuming the government's contention is correct, the mere *existence* of a contractor's compliance obligations cannot be deployed to defeat a breach of contract claim — and certainly not as a matter of Tucker Act jurisdiction.  The typical provider of goods or services to the federal government is subject to literally volumes of compliance requirements, but the government has never contended that their mere existence precludes a breach of contract claim.  Yet, that is, in essence, what the government argues here.  If the government wants to demonstrate that HACS has failed to meet its compliance obligations in a manner that permitted HUD to withhold the funds in question, the government remains free to do so, but it has not done so on the record thus far, and likely could not do so at the motion to dismiss stage in any event.

[26] For example, the government argues that certain regulations incorporated into the HACS ACC "impose conditions on a PHA's receipt of HUD's financial assistance." Def. Mot. at 6. Certainly, the government is free to demonstrate, as a matter of fact and law, that HACS is not entitled to breach damages based upon those regulations.  The government, however, has not made such a showing in its motion to dismiss.  Again, the fact that there are "various limits on a PHA's eligibility to receive Section 9 assistance in the first place[,]" *id.*, merely begs the question of whether HACS is entitled to money damages by, *inter alia*, having met eligibility criteria and/or its obligations under the parties' ACC.

[27] *Cf. GHS Health Maint. Org., Inc. v. United States*, 536 F.3d 1293, 1305 n.7 (Fed. Cir. 2008) ("OPM's argument ignores the fungible nature of money.  It makes little or no difference whether reconciliation results in cash payments or in adjustments to future rates.").

merely because HACS is "subject to HUD's ongoing supervision." Def. Mot. at 5.[28] The government certainly cannot engage in such circular reasoning to obtain a jurisdictional dismissal. Put differently, the government's "strings-attached" argument merely begs the question whether HACS is due to be paid the sums in question or not, pursuant to the terms of the parties' ACC; but, the answer to that question surely is not dispositive as to the issue of this Court's jurisdiction.

While the government concedes that the HACS ACC is a contract that may support a claim for money damages pursuant to the Tucker Act, *see* Def. Rep. at 3 n.1 — and despite HACS's repeated assertions that it seeks money damages due to HUD's breach of its contractual duties — the government nevertheless argues that the FAC actually requests a form of equitable relief related to a *res*:  *i.e.*, a "strings-attached grant[,]" in the government's words. Def. Mot. at 10, 18. The government's approach is nothing more than a jurisdictional sleight-of-hand, one which this Court rejects. *Stovall v. United States*, 71 Fed. Cl. 696, 699–701 (2006) (cataloging Tucker Act cases where jurisdiction was upheld, including over HUD contracts and grant agreements, and explaining that "defendant can anchor its hollow view of this court's jurisdiction neither to the natural reading of the language of the Tucker Act nor to any binding precedent construing that statute"). Putting aside the obvious point that a complaint for money due and owing under a contract could always be recharacterized as a claim for specific performance (*i.e.*, injunctive relief to compel payment), there is no support for the government's position, which would require this Court to bifurcate its jurisdiction depending upon the precise nature of the claimed contract damages. In that regard, the government concedes that "[i]f HACS [had] alleged and sued for consequential damages caused by the alleged withholding of Section 9 assistance, there would be Tucker Act jurisdiction over such a claim[,]" but because "HACS has instead sued for the allegedly withheld Section 9 assistance itself (the *res*), . . . there is no jurisdiction over this suit." Def. Mot. at 18. This Court declines to engineer such a novel, jurisdictional Frankenstein, in the absence of any binding authority even sketching the outline of such a creature.

The applicable Federal Circuit precedent entirely forecloses the government's argument. HACS is not suing for the return of a thing, the issuance of an order awarding a grant agreement, or anything similar that would involve an injunction (*i.e.*, a coercive order). *PGBA, LLC v. United States*, 389 F.3d 1219, 1228 n.6 (Fed. Cir. 2004)

---

[28] As explained in more detail below regarding the RCFC 12(b)(6) portion of the government's motion, HACS appears correct that the sums at issue do *not* relate to *prospective* awards of grants having yet further strings-attached, but rather to amounts already budgeted and allocated to HACS – and that HACS already has earned (at least allegedly) – but to which the agency has denied HACS access or otherwise has refused to pay to HACS.

("an injunction either mandates or prohibits particular conduct"); *Sierra Nevada Corp. v. United States*, 107 Fed. Cl. 735, 761 (2012) ("'An injunction is a coercive order by a court directing a party to do or refrain from doing something, and applies to future actions.'" (quoting *Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052, 1055 (1st Cir. 1987))). HACS instead seeks contract damages (in the form of a money judgment) for the government's failure to pay what is allegedly due to HACS under the ACC – a classic breach of contract claim. The Court's conclusion in this regard is further bolstered by the fact that the government did not cite in its briefs — and could not cite at oral argument — even a single case permitting this Court to recharacterize the FAC in a manner that would shut the courthouse door on HACS.

The remainder of this section of the Court's opinion addresses the primary Federal Circuit decisions upon which the government relies — *NCMS* and *Lummi Tribe* — along with other relevant Tucker Act jurisprudence for greater context. Binding authority demonstrates this Court's jurisdiction to decide the merits of HACS's claims.

In *Total Medical Management, Inc. v. United States*, the government — similar to its assertions here regarding so-called "strings-attached" grants — argued that certain memoranda of understanding between a contractor and the government, were "generally unenforceable." 104 F.3d 1314, 1320 (Fed. Cir. 1997). The Federal Circuit rejected the government's argument, explaining that "[the plaintiff] is to provide discounted medical services; the [government] hospital is to provide free space and support staff and to encourage dependents to use [plaintiff's] services[;] [and] [t]he . . . regulatory scheme provides payment details." *Id.* Thus, the Federal Circuit concluded that "[t]he determination of damages *or specific performance* would flow naturally from a breach of these duties." *Id.* (emphasis added). In that case, and unlike the ACC at issue here, "the resource sharing agreements" were "not labeled 'contracts' in the regulatory scheme." *Id.* Nevertheless, the Federal Circuit held that "the failure of Congress to use the word 'contract' does not preclude the holding that a binding contract is formed." *Id.* In contrast, in this case, the HACS ACC — both by its terms and pursuant to HUD's regulatory definitions — is clearly a government contract, a point that the government does not dispute. Def. Rep. at 3 n.1.

Moreover, in *Total Medical Management*, the Federal Circuit expressly relied upon, and endorsed, this Court's decision in *Thermalon Industries, Ltd. v. United States,* which held that a National Science Foundation research grant constitutes a binding contract, pursuant to which a plaintiff could assert a breach claim within this Court's Tucker Act jurisdiction. 104 F.3d at 1320 (citing *Thermalon*, 34 Fed. Cl. 411, 415 (1995)). Notably, in *Thermalon*, the agreement at issue was quite literally a strings-attached grant, as the government uses that term in the instant case. *See* 34 Fed. Cl. at 413-14. The government similarly attempted to obtain a jurisdictional dismissal, but this Court rejected the government's argument: "There is no suggestion . . . that procurement

contracts are the only type of contracts enforceable under the Tucker Act or that grant agreements that satisfy all of the ordinary requirements for a government contract should not be classified as contracts enforceable under the Tucker Act." *Id.* at 417.

The Federal Circuit once again endorsed *Thermalon* in *Trauma Service Group, Ltd. v. United States*, 104 F.3d 1321 (Fed. Cir. 1997). In *Trauma Service*, the Federal Circuit declined to reach "the question of whether the MOA [at issue] is a valid contract[,]" but explained that "any agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." 104 F.3d at 1326 (citing *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990), and *Thermalon*, 34 Fed. Cl. at 414). The Federal Circuit repeatedly has affirmed this general principle. *See, e.g., Massie v. United States*, 166 F.3d 1184, 1188 (Fed. Cir. 1999) (quoting *Trauma Service*, and holding the Court of Federal Claims has jurisdiction to consider a claim for breach of an agreement to pay a Military Claims Act claim); *Indus. Door Contractors, Inc. v. United States*, 200 F. App'x 977, 979 (Fed. Cir. 2006) (quoting *Trauma Service*, and holding Court of Federal Claims had jurisdiction over contract to settle protest, and ordering that "[o]n remand, the trial court must determine whether the contract was breached and, if so, fashion an appropriate remedy"); *Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1346 (Fed. Cir. 2001) (quoting *Massie* and *Trauma Service*).

If the Federal Circuit's repeated agreement with *Thermalon* were insufficient to demonstrate that the government's position here is erroneous, the Federal Circuit's decision in *San Juan City College*, 391 F.3d at 1357, makes the government's argument in this case all but untenable. Assuming *arguendo* that the government is correct that the payments HUD allegedly must make to HACS (pursuant to the HACS ACC) indeed may be characterized as "strings-attached" grants — the precise nature of such strings the government thus far having failed to demonstrate — *San Juan City College* appears to have involved an analogous grant contract. In that case, the Court of Federal Claims "found it unnecessary to determine whether the Department [of Education] had breached the Agreement . . . because it concluded that 'as a matter of law, violation of the agreement insofar as it involves a failure to offer a hearing under [a particular regulation] creates a right only to equitable relief.'" *Id.* at 1359 (quoting *San Juan City College v. United States*, 58 Fed. Cl. 26, 32 (2004)). The trial court further held that the agreement at issue "'even if viewed in traditional contract terms does not, as a matter of law, permit the recovery of the type of damages they seek.'" 391 F.3d at 1359 (quoting 58 Fed. Cl. at 30). On appeal, the Federal Circuit reversed. *Id.* at 1365.

The Federal Circuit in *San Juan City College* first noted that the program participation agreement at issue required the plaintiff educational institution to comply with "numerous specific and detailed requirements" pursuant to statute and regulations. 391 F.3d at 1360. The court explained, however, that "[a]lthough it may

well be, as the Court of Federal Claims [below] stated, that most (and perhaps all) of these contractual provisions were required by and incorporated the government regulations, that does not make them any less contractual obligations or provisions, or constitute a valid reason for not treating them as such." *Id.* Accordingly, the Federal Circuit held that "nothing in either the Agreement itself or in the governing statute or regulations that supports the Court of Federal Claims' view that the parties understood damages would not be available in the event of breach." *Id.* at 1361. Of course, that was hardly surprising given that "[n]ormally contracts do not contain provisions specifying the basis for the award of damages in case of breach, with the exception of provisions governing damages in particular situations, such as liquidated damages for delay or other specified breaches." *Id.; see Stovall,* 71 Fed. Cl. at 699–701.

Accordingly, whether HACS can prove its breach and damages is a merits issue, not a jurisdictional one. As the Federal Circuit held in *San Juan City College,* "[t]he fact that this contract covers *government financial grants* does not warrant a different standard. If the government has breached the Agreement, the [Plaintiff] is entitled to seek whatever damages it is entitled to receive." 319 F.3d at 1361 (emphasis added). In so holding, the Federal Circuit relied upon the Supreme Court's decision in *United States v. Winstar Corp.,* noting that "'in the area of government contracts, as with private agreements there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement.'" *Id.* (quoting *Sanders v. United States,* 252 F.3d 1329, 1334 (Fed. Cir. 2001), and citing *Winstar Corp.,* 518 U.S. 839, 885 (1996)).

The government, in its motion to dismiss, attempts to distinguish *San Juan City College* on the grounds that it involved a claim for consequential damages rather than ordinary contract damages. Def. Mot. at 18-19. This Court, however, cannot locate an iota of jurisprudential evidence that there is a *jurisdictional* distinction arising from the type of contract damages a plaintiff seeks. In that regard, the government notably failed to address the following critical language from the Federal Circuit's decision in *San Juan City College*: "There is no reason to believe that, because federal grant programs may be 'in the nature of a contract,' special and different rules govern the determination of damages for a breach of a formal written contract that involves a federal grant of funds . . . ." 391 F.3d at 1362. Again, the government does not deal *at all* with this binding holding. More troubling still, the government does not attempt to distinguish whatsoever the underlying nature or terms of the agreement at issue in *San Juan City College* from the HACS ACC. *See* Def. Mot. at 18-19 (attempting to distinguish *San Juan City College* solely based on the form of damages sought in that case).

In any event, the government, as a factual matter, cannot distinguish *San Juan City College* based on the nature of the damages claim in that case. As this Court does with respect to HACS's FAC, the Federal Circuit in *San Juan City College* looked particularly to the "prayer for relief in the complaint," noting that the plaintiff in that case "sought damages including consequential damages for lost profits." 391 F.3d at 1362 (internal quotes omitted). The government, in contrast to its position in the instant

case, "argue[d] that lost profits *cannot* be recovered[.]" *Id.* (emphasis added).  The Federal Circuit declined to reach that question, however, because the court held that "[t]he recovery the [plaintiff] College seeks *is not limited to lost profits, but more broadly encompasses other types of damages as well.*"  391 F.3d at 1362 (emphasis added).[29]  Thus, the Federal Circuit implicitly, but clearly, held that the issue of damages is *not* jurisdictional. *Id.* ("[I]t would be premature to decide whether the College could recover lost profits unless and until the Court of Federal Claims decides the Department breached the agreement."); *see also id.* at 1365 ("The case is remanded to the [Court of Federal Claims] to determine first, whether the Department breached the agreement.  If the court finds that the Department did so, then it should determine what damages, if any, the College is entitled to recover.").

To reiterate, the government cites no authority of any kind — neither binding nor persuasive — to support the contention that Tucker Act jurisdiction may depend on the type of damages sought, let alone authority supporting that the Court *would have* jurisdiction to consider a claim for lost profits or consequential damages, *but not* to consider a claim for a specific sum of money presently due and owing under a contract.  In any event, this Court rejects such a distinction because lost profits are nothing more than a type of expectancy damages and there is nothing special about either damages category, aside from the type of proof required. *Long Island Sav. Bank, FSB v. United States*, 60 Fed. Cl. 80, 89 (2004) (discussing cases and explaining that "[t]he principle underlying the availability of contract damages is that the promisee is entitled to the benefits it reasonably expected to receive had the breach not occurred, *i.e.,* the profits it would reasonably have earned but for the breach"); *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1380 (Fed. Cir. 2001) ("expectancy damages" are often fashioned in terms of lost profits, but may include other damage measures).

If HACS is able to demonstrate that it has complied with the terms of its contract with the government sufficient to trigger HUD's payment obligations, and if HUD had no basis to withhold the funds at issue,[30] the government at that point must "perform, and accept whatever benefits and losses the contract gives them, or they can refuse to

---

[29] Although the funds earned by the plaintiff college under the agreement at issue in *San Juan City College* appear to have been repaid either prior to, or during the litigation, there is no suggestion in the Federal Circuit's decision that any jurisdictional issue turned on that fact.  391 F.3d at 1364.  Moreover, as relevant to HACS's claims, the Federal Circuit's opinion suggested that a breach of contract claim could arise from procedural violations related to the agency's suspending funding to the college. *Id.* at 1363-64.

[30] As discussed below, the government points to many asserted "strings" and oversight powers, but always in sweeping generalities or with general citations.  The government does not demonstrate, as a matter of law, that it was (or currently is) entitled under the HACS ACC to withhold the specific funds HACS claims as breach damages.

perform and pay the consequences." *Glendale Fed. Bank*, 239 F.3d at 1379–80.[31]  "One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." *Id.* (citing *Restatement (Second) of Contracts* § 344(a) (1981)).[32]  In that regard, "[t]he benefits that were expected from the contract, 'expectancy damages,' are often equated with lost profits, although they can include other damage elements as well." 239 F.3d at 1379-80 (citing *Restatement (Second) of Contracts* § 347).  The Federal Circuit has recognized that "[t]he problems of proof attendant on the burden placed on the non-breaching party of establishing lost profits — on establishing what might have been — are well recognized." 239 F.3d at 1379–80 ("[T]he proof problems can in some situations prove to be insurmountable.").  But any such problems of proof have nothing to do with Tucker Act jurisdiction.[33]  And, in any event, the government here concedes that this Court *does* have jurisdiction over the FAC to the extent it seeks consequential damages, which the FAC fairly may be read to do. *See* FAC ¶ 14 ("Theses requests are extremely time consuming as well as costly in time and funds as they must comply with Obligation Submission Review Requirements for each and every invoice along with extensive documentation not matter how small or repetitive the invoice may be."); *id.* ¶ 15 ("These audits were unduly burdensome on HACS as they are not only costly, but they also reduced Plaintiff's ability to verse its day-to-day operations."); *id.* at 10 (Prayer for Relief) ("Award the Plaintiff any other relief that is proper.").

The government, in support of its motion to dismiss, further relies upon the Federal Circuit's decision in *NCMS*.  *See* Def. Mot. at 19–22.  But, despite the significance the government assigns to that case, the complaint at issue there clearly did not involve any claim for contract breach damages.  In *NCMS*, the Federal Circuit considered a district court's transfer order to this Court on the grounds that the complaint at issue constituted "a contract claim against the government in excess of $10,000, for which

---

[31] *Lins v. United States*, 688 F.2d 784, 786 (Ct. Cl. 1982) ("[W]hen the plaintiff has done all he must do to establish his entitlement to payment, e.g., perform on his contract, the claim accrues.").

[32] "The general rule in common law breach of contract cases is to award damages sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed." *San Carlos Irr. & Drainage Dist. v. United States*, 111 F.3d 1557, 1562–63 (Fed. Cir. 1997), *as corrected on reh'g* (June 18, 1997).

[33] *Cf. Data Mktg. Co. of Virginia v. United States*, 107 F. App'x 187, 197 (Fed. Cir. 2004) ("Our recent decision in *Energy Capital Corp. v. United States* establishes that a loss of profits claim that flows directly from the contract is not necessarily a form of consequential or incidental damages.  302 F.3d 1314 (Fed. Cir. 2002).  Consequential or incidental damages are those that are speculative or otherwise not foreseen by the parties.  Lost profits are not necessarily speculative or consequential per se . . . lost profits may be recovered even if there is a contractual clause excluding liability for incidental or consequential damages . . . [and] lost profits should typically be considered direct damages rather than consequential damages in a business contract[.]" (additional citations omitted)).

there is no District Court jurisdiction." 114 F.3d at 198 (internal quotes omitted). The Federal Circuit reversed the transfer order, agreeing with the plaintiff that the "case was properly brought in the United States district court." 114 F.3d at 197. Thus, in *NCMS*, the plaintiff itself did not believe it was asserting a contract breach claim. Our appellate court concurred, concluding that "[t]he first three counts of the amended complaint are plainly based on the Appropriations Act and therefore do no state a contract-based claim[,]" while the "[t]he fourth count requests specific performance of the Cooperative Agreement between NCMS and the Air Force, a remedy the Court of Federal Claims is not empowered to grant." 114 F.3d at 198. The Federal Circuit acknowledged, however — with language helpful for HACS here, albeit in dicta — that "a request for specific performance of a contract might in some cases be construed as an action for the payment of money[,]" supporting Tucker Act jurisdiction. *Id.* That was not the case in *NCMS* because the plaintiff effectively had sought "[a]n order directing the Air Force to supplement the Cooperative Agreement or engage in a new agreement with [the plaintiff]." *Id.* at 199. Such relief indisputably "would be equitable in nature and thus would not be within the jurisdiction of the Court of Federal Claims." *Id.* But, HACS seeks nothing of the kind in its FAC.

In *NCMS*, the Federal Circuit noted that the complaint "ma[d]e clear that [the plaintiff] anticipates the need for injunctive relief, such as an order enjoining the defendants from obligating and disbursing particular funds that should be reserved for [plaintiff.]" 114 F.3d at 201–02 ("NCMS is in effect asking that the Air Force be required to expand the existing contractual relationship or to create a new one to cover the remaining appropriated but unobligated funds."). Because "[t]he Tucker Act . . . does not empower the Court of Federal Claims to grant that kind of equitable relief," the Federal Circuit concluded that jurisdiction was proper in the district court pursuant to the APA. *Id.* In contrast, HACS neither asks for nor requires an injunction of any kind, but rather seeks contract damages in the form of a money judgment for funds allegedly due and owing pursuant to the HACS ACC (in addition to, potentially, consequential damages).[34] *SAHA*, 143 Fed. Cl. at 453–55 (correctly distinguishing *NCMS* as a case

---

[34] Tr. 54:12-54:17 ("THE COURT: Does the Housing Authority request an expansion of their existing contractual relationship? [DEFENDANT'S COUNSEL]: No, Your Honor. THE COURT: And does it ask to create a new one? [DEFENDANT'S COUNSEL]: No."). The government's concessions and explanations during oral argument are relevant to the Court's instant decision, as "'a lawyer's statements may constitute a binding admission of a party[ ]' if the statements are 'deliberate, clear, and unambiguous[.]'" *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 347 (4th Cir. 2014) (quoting *Fraternal Order of Police Lodge No. 89 v. Prince George's Cty., Md.*, 608 F.3d 183, 190 (4th Cir. 2010)); *see Checo v. Shinseki*, 748 F.3d 1373, 1378 n.5 (Fed. Cir. 2014) (questioning the Veterans Court's "reluctance to accept [a] concession" made at oral argument and citing case law for the proposition that admissions are generally binding on the parties).

involving a request for equitable relief from a claim for "compensatory monetary damages for the government's alleged breach" of contract); *Boaz*, 141 Fed. Cl. at 83 ("Critical to that result [in *NCMS*] was the fact that the plaintiff's claims were based on a statute and that the plaintiff sought equitable relief, not money damages.").

      The government also relies upon *Lummi Tribe*, but, in that case, the only issue before the Federal Circuit was whether the "Claims Court erred in finding [Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA")] to be a money-mandating statute[.]"  870 F.3d at 1317.  The Court still does not understand where this decision gets the government; the initial *Lummi Tribe* Federal Circuit decision did not involve a contract claim.  *Id.*  Indeed, the government inexplicably fails to mention that the *Lummi Tribe* case in fact came before the Federal Circuit a second time, where the contract claims were specifically at issue.  In that second appeal, the Federal Circuit considered whether the Court of Federal Claims "erred by dismissing [the tribe's] *independent claims for breach of contract*, breach of fiduciary duty, and breach of trust."  *Lummi Tribe of the Lummi Reservation Washington v. United States*, 788 F. App'x 717, 721 (Fed. Cir. 2019) (emphasis added).  The Federal Circuit explained that "[r]esolution of this issue turns on whether these claims were within the scope of our prior mandate."  *Id.*  The court "conclude[d] that they were not."  *Id.*  Thus, the Federal Circuit explicitly held that its first decision in the case did not "resolve Lummi's breach of contract [and other claims] by 'necessary implication,' because resolving those claims was not necessary to our conclusions that NAHASDA is not a money-mandating statute or that funds not in Lummi's possession or control could not be illegally exacted."  *Id.* at 722 (holding that "Lummi's breach of contract, breach of fiduciary duty, and breach of trust claims were therefore not with within the scope of our prior mandate" and that the "prior mandate resolved only the question of the Claims Court's jurisdiction over Lummi's NAHASDA and illegal exaction claims").  Thus, in *Lummi Tribe*, the Federal Circuit necessarily concluded that this Court *had* Tucker Act jurisdiction over the contract claims in that case, an outcome that the government simply does not address.

      In sum, in *NCMS*, the plaintiff specifically disclaimed that it was seeking a Tucker Act remedy; and, in *Lummi Tribe*, the Federal Circuit expressly remanded the plaintiff's contract claim to this Court for a decision on the merits.  Brief of Plaintiff-Appellant, 1996 WL 33455792, *8, 14, *National Center For Manufacturing Sciences v. United States*, 114 F.3d 196 (Fed. Cir. 1997) (No. 96-1423) (Fed. Cir. Aug. 26, 1996) (noting that NCMS "does not seek compensatory money damages," that "[i]ts claim is based on rights grounded in federal statutes, not contractual provisions, and that "NCMS seeks no compensation from the Air Force for a violation of the Cooperative Agreement"); *Lummi Tribe*, 788 F. App'x at 721–22.  Neither decision supports the government's sweeping jurisdictional contentions in this case.

The government's argument[35] that the Supreme Court's decision in *Bowen*, 487 U.S. at 879, precludes jurisdiction in this case similarly fails.  And for good reason – the Federal Circuit consistently has recognized *Bowen*'s limited applicability outside of the Medicaid context:

> In concluding that a Medicaid disallowance claim was not a contract action, *Bowen* relied on the congressional intent for the Medicaid program, the role of state law in Medicaid disallowance actions, and the long-term Medicaid interactions between the states and the Federal Government involving ever-shifting balance sheets.

*Brighton Vill. Assocs. v. United States*, 52 F.3d 1056, 1059 n.3 (Fed. Cir. 1995).[36]  With regard to HUD contracts, in particular, the Federal Circuit has held that "[n]one of these features unique to Medicaid disallowance disputes applies to Section 8 housing contracts."  *Id.* (citing cases and noting that "sister circuits have consistently read *Bowen* to reinforce the jurisdictional role of the Court of Federal Claims in resolving contract disputes outside the complex Medicaid arena.").[37]  As in *Brighton Village Associates* and

---

[35] Def. Mot. at 15-16.

[36] *See also Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1127 (Fed. Cir. 2007) ("*Bowen* [was] a dispute between two sovereigns—a state government and the federal government—implicating federalism issues; the dispute centered on the administration of a major federal grant, the Medicaid program, involving enormous sums of money and complex interactions between the governments and the beneficiaries; at issue were the institutional arrangements between these two governments; the governments were locked into a fabric of long-term administration of the program; and the money involved in the uncovered education services was a small fraction of the total reimbursement the state received each year for its Medicaid costs under the program.  In addition, the Court's focus was on the statutory requirements set forth in this complex grant program—nowhere in *Bowen* did the Court make reference to the existence of any specific contract or express agreement defining the relationship between the parties.")

[37] The Supreme Court also recently distinguished *Bowen* on similar grounds (albeit in the context of a money-mandating, and not a contract, claim).  *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1330–31 (2020) (holding that "*Bowen* is distinguishable on several scores" because "[i]n *Bowen*, the State did not seek money damages, but instead sued for prospective declaratory and injunctive relief to clarify the extent of the Government's ongoing obligations under the Medicaid program" and "because of the litigants' 'complex ongoing relationship,' which made it important that a district court adjudicate future disputes" (quoting 487 U.S. at 905)); *see also Bowen*, 487 U.S. 904–05 n.39 (holding that the APA "is tailored" to "[m]anaging the relationships between States and the Federal Government that occur over time and that involve constantly shifting balance sheets," while the Tucker Act is suited to "remedy[ing] particular categories of past injuries or labors for which various federal statutes provide compensation").

"[u]nlike *Katz* [*v. Cisneros*], this case features a contractor in privity with the Government." 52 F.3d at 1060 (discussing *Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994)). HACS "seeks unliquidated damages from HUD for breach of an express contract" and, thus, "[t]his is a contract case." 52 F.3d at 1060.  Just as the plaintiff did in *Brighton Village*, HACS, too, "seeks retroactive monetary relief for HUD's failure to" pay amounts due, relief that "also more clearly denotes a contract damages action." *Id.* (contrasting *Katz*, which "involved an award of prospective relief, namely, the builder's attempt to require HUD to calculate future contract rents in conformity with the statute" (citing 16 F.3d at 1209)).[38]

As the Federal Circuit explained in *Brighton Village* — again, a case involving a HUD contract — "a 'pure breach' claim accrues when a plaintiff has done all he must do to establish his entitlement to payment and the defendant does not pay." 52 F.3d at 1060.  In this case, HACS does not contend that it is entitled to the sums sought prospectively or as a result of injunctive or other equitable relief.  Rather, HACS alleges that it is entitled to the sums sought pursuant to previously submitted, proper requests for payment that the government improperly refused to pay, in violation of either contract terms or the government's implied contractual duty of good faith and fair dealing.[39]  FAC ¶¶ 18–20, 23–26.

The government attempts to distinguish *Brighton Village* on the grounds that "[t]he Federal Circuit did not reach the money-mandating question there."  Def. Mot. at 27.  That assertion is a non-sequitur, however, insofar as the Federal Circuit held that "the Court of Federal Claims properly exercised jurisdiction" where plaintiff sought "damages from HUD *for breach of an express contract*."  *Brighton Vill. Assocs.*, 52 F.3d at 1059 (emphasis added).  The government baldly asserts that the Section 9 ACC at issue

---

[38] Moreover, "[t]his court does have authority to issue rulings of law declaring the rights of parties under a contract where such rulings are necessary to the resolution of a claim for money presently due and owing." *Hydrothermal Energy Corp. v. United States*, 26 Cl. Ct. 7, 16 (1992) (citing *Pauley Petroleum, Inc. v. United States*, 591 F.2d 1308, 1315 (Ct. Cl. 1979) (en banc), *cert. denied*, 444 U.S. 898 (1979)).  "Labeling an argument 'equitable' does not, however, automatically deprive this Court of jurisdiction."  *Ambase Corp. v. United States,* 61 Fed. Cl. 794, 797 (2004).  That is, "merely because the court must make a ruling of law . . . in order to arrive at a money judgment does not render this court's decision a 'declaratory judgment'. . . ." *Pauley Petroleum*, 591 F.2d at 1315; *see Halim v. United States*, 106 Fed. Cl. 677, 685 (2012); *Doko Farms v. United States,* 13 Cl. Ct. 48, 60 (1987) (noting that "Court only has jurisdiction" to declare a plaintiff's rights when doing so is "incidental and subordinate to" a money judgment).

[39] Tr. 8:24-9:2 ("[PLAINTIFF'S COUNSEL]:  [W]e have been using our own reserve, which are now depleted, funds to meet the operating expenses of the Housing Authority because HUD has not authorized the release of these funds.").

here and the Section 8 Housing Assistance Payments ("HAP") contracts[40] at issue in *Brighton Village* "are very different agreements, so case law on the latter is not instructive here." Def. Mot. at 27. The government, however, repeated its similar omission from its analysis of *San Juan City College*, offering no specific comparisons of the terms of the relevant ACC and HAP agreements. Moreover, at least one Federal Circuit decision has compared those two types of HUD contracts, suggesting more than a passing similarity between them. *CMS Contract Management Services*, 745 F.3d at 1381–82 (discussing Section 8 of the Housing Act of 1937, and comparing ACCs and HAPs).[41] Other courts explaining HUD programs likewise suggest that there is no distinction between the two types of agreements (*i.e.*, ACCs and HAPs) that would result in a different jurisdictional outcome:

> In 1974, the Housing Act of 1937 was amended to create the Section 8 Housing Program ("Section 8 Program"), which authorizes [HUD] to provide federally subsidized housing benefits through rental assistance programs. HUD utilizes two types of contracts to implement the Section 8 Program: (1) housing assistance program contracts ("HAP contract") and (2) annual contributions contracts ("ACC"). Through a HAP contract, HUD contracts directly with the owner of a privately-owned dwelling ("project owner") to whom HUD pays subsidies. Alternatively, through an ACC, HUD contracts with a public housing agency ("PHA"), and the PHA then enters into HAP contracts with project owners.

---

[40] "Traditionally, HUD entered into [HAP] contracts [] directly with project owners and paid the subsidies directly. However, the 1974 amendment to the Housing Act gave HUD a second option—to enter into an [ACC] with a [PHA]. The PHA would then enter into HAP contracts with project owners. HUD provided the PHAs funds to pay the subsidies to the project owners." *CMS Contract Management Services v. Massachusetts Housing Finance Agency*, 745 F.3d 1379, 1381–82 (Fed. Cir. 2014); *see* 24 C.F.R. § 891.560 (defining the rights and requirements pursuant to a HAP contract).

[41] In *Gallman v. Pierce*, 639 F. Supp. 472, 473–74 (N.D. Cal. 1986), the district court noted that "[t]he ACC . . . mandates that the PHA incorporate certain contractual provisions in all agreements with a private landlord participating in the Section 8 HAP program." The government provides no basis for this Court to conclude that HUD's HAP contracts with housing owners contains materially different terms – for the purposes of Tucker Act jurisdiction — from those contained in HUD's ACCs. *See Brighton Vill.*, 52 F.3d 1058 (noting that the parties executed a "Regulatory Agreement" and that "[t]he HAP contract bound the parties to the statutes and regulations of the Section 8 program"); *Crest A Apartments Ltd. II v. United States*, 52 Fed. Cl. 607, 611 (2002) (considering whether "HUD breached the Regulatory Agreement and the HAP Contract by failing to consider and grant its rent increase requests"); *Englewood Terrace Ltd. P'ship v. United States*, 79 Fed. Cl. 516, 550 (2007), *aff'd*, 479 F. App'x 969 (Fed. Cir. 2012).

> HUD provides funds to the PHA, and the PHA then uses
> those funds to pay subsidies to project owners.

*Ashmore v. CGI Grp. Inc.*, 138 F. Supp. 3d 329, 333–34 (S.D.N.Y. 2015) (citing *CMS Contract Mgmt. Servs.*, 745 F.3d at 1381–82) (other internal citations omitted), *aff'd*, 923 F.3d 260 (2d Cir. 2019)).[42]  Given the regulatory scheme applicable to the Section 8 program, this Court finds it impossible to buy the government's claimed jurisdictional distinction between breach claims based upon Section 8 HAP contracts, on the one hand, and breach claims based upon ACCs, on the other.[43]

---

[42] *See also Evergreen Square of Cudahy v. Wisconsin Hous. & Econ. Dev. Auth.*, 2016 WL 53871, at *2 (E.D. Wis. Jan. 4, 2016) ("Under the project-based Section 8 program, HUD channels rental assistance payments through a two-tiered system.  At one level, HUD enters into an ACC with a [PHA] . . . .  Under the ACC, HUD provides rental assistance payments (also known as annual contributions) to fund the housing agency's rental subsidy payments to an owner of rental housing.  The PHA in turn enters into a HAP contract with the owner, under which the owner receives monthly housing assistance payments from the PHA." (footnotes and internal record citations omitted)); *Le Gros Enterprises, LLC v. Wisconsin Hous. & Econ. Dev. Auth., Julian Castro*, 2016 WL 5921819, at *1 (E.D. Wis. Oct. 11, 2016) ("Under the ACC, HUD provides annual contributions to the PHA that enables the PHA to make monthly housing assistance payments to a property owner pursuant to a HAP contract."); *Price v. Pierce*, 615 F. Supp. 173, 178 (N.D. Ill. 1985) ("Under the Section 8 program, the Secretary is authorized to implement the program by entering into [ACCs] with a [PHA] pursuant to which such agency may enter into [HAP] contracts with owners of dwelling units to assist eligible persons.").  In *CMS Contract Management*, HUD contended that certain performance-based ACCs were "cooperative agreements, and thus, outside the scope of federal procurement law."  745 F.3d at 1383.  The Federal Circuit disagreed, holding that the ACCs at issue in that case were "procurement contracts and not cooperative agreements" because their "primary purpose" is to procure "services . . . to support HUD's staff and provide assistance to HUD with the oversight and monitoring of Section 8 housing assistance."  *Id.* at 1385.  Although we need not reach the issues here, the government's view of the HACS ACC would be undermined entirely if it were categorized as a procurement contract similar to the performance-based ACCs in *CMS Contract Management*.  In any event, what *is* evident is that the government's repeated attempts to avoid this Court's Tucker Act jurisdiction (with regard to various HUD contracts) have failed.  *See CMS Contract Mgmt. Servs. v. United States*, 110 Fed. Cl. 537, 551 (2013), *rev'd sub nom. CMS Contract Mgmt. Servs. v. Massachusetts Hous. Fin. Agency*, 745 F.3d 1379 (Fed. Cir. 2014); *Brighton Vill.*, 52 F.3d at 1059; *Stovall*, 71 Fed. Cl. at 699–701 (cataloging cases).

[43] HUD's own description of Section 8 HAP contracts are similar to the agency's definition of the ACC.  *Compare*  https://www.hud.gov/program_offices/housing/mfh/rfp/s8bkinfo ("Section 8 Program Background Information"), last accessed on July 6, 2020 (describing "Owner Obligations") and explaining that "[i]n consideration for the receipt of Section 8 assistance, the HAP Contracts impose certain general obligation on the owners of assisted properties") *with* 24 C.F.R. § 900.115 (describing an ACC as "a contract prescribed by HUD for

Nor does the fact that the HACS ACC arises out of a statutory and regulatory scheme remove Tucker Act jurisdiction. *See Alvarado Hospital, LLC v. Price*, 868 F.3d 983, 995 (Fed. Cir. 2017) ("[T]he fact that the court may have to interpret an Act or make other determinations regarding principles of federal law in order to resolve the contract claim does not deprive [this Court] of jurisdiction to decide that claim." (citing *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1367 (Fed. Cir. 1998))).

"In sum, when the plaintiff's claims, regardless of the form in which the complaint is drafted, are understood to be seeking a monetary reward from the Government, then . . . a straightforward analysis calls for determining whether the case falls within the jurisdiction of the Court of Federal Claims." *Suburban Mortg. Assocs.*, 480 F.3d at 1126. If this Court "can provide an adequate remedy—if a money judgment will give the plaintiff essentially the remedy he seeks—then the proper forum for resolution of the dispute is not a district court under the APA but the Court of Federal Claims under the Tucker Act." *Id.* ("There is no need at that point to even address the other APA limitations . . . The three limitations function in the disjunctive; the application of any one is enough to deny a district court jurisdiction under the APA."). That is the case here. A plain and fair reading of the FAC demonstrates that HACS seeks a money judgment for funds that HUD allegedly owes HACS under the terms of the ACC, but that HUD has not paid. The Court finds it difficult to conceive of a more classic breach of contract claim. Thus, far from HACS's dressing up an APA claim in Tucker Act clothes, it is the government that attempts to rewrite the FAC so as avoid this Court's jurisdiction. The plaintiff, however, is "the master of the complaint," and this Court will not reimagine the FAC here for the government's benefit. *Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831 (2002) (internal quotation omitted); *Mients v. United States*, 50 Fed. Cl. 665, 671 (2001) ("Plaintiff . . . remains the master of his complaint[.]").

Finally, in an argument that barely spans a single page, the government contends that the FAC's reference to "arbitrary and capricious" agency conduct "is plainly a claim alleging an APA violation[.]" Def. Mot. at 27. But, as demonstrated above, HACS seeks money damages for the government's breach of contractual duties. Any reference to "arbitrary and capricious" agency action does not require this Court to recharacterize the FAC as an APA claim. To the contrary, HACS specifically asserts that HUD's "arbitrary and capricious actions *constitute a breach of contract*" and that "HACS is [thus] entitled to money damages." FAC ¶ 21 (emphasis added). The cases are legion establishing that where a contract affords discretion to the government, "exercise of that discretion must be fair and reasonable, not arbitrary and capricious." *Everett Plywood Corp. v. United States*, 512 F.2d 1082, 1090 (Ct. Cl. 1975); *see Pacific Far East Line v. United*

loans and contributions, which may be in the form of [an] operating subsidy, whereby HUD agrees to provide financial assistance and the PHA agrees to comply with HUD requirements for the development and operation of its public housing projects[]").

*States,* 394 F.2d 990, 998 (Ct. Cl. 1968) (where contract authorized agency to determine method for calculating subsidies, change in methodology was analyzed to determine whether it was reasonable); *W. G. Cornell Co. of Washington D. C. v. United States*, 376 F.2d 299, 313 (Ct. Cl. 1967) ("While the Government had the undisputed right to decide if the blanket material met the standards set forth in the contract[], 'it is equally elementary that the discretion involved must be exercised reasonably and fairly.'" (quoting *Fox Valley Engineering, Inc. v. United States*, 151 Ct. Cl. 228, 236 (1960))); *Reservation Ranch v. United States*, 39 Fed. Cl. 696, 714–15 (1997) ("[W]hen the parties to a contract vest one party with the discretion to make a critical factual determination under the contract, this court narrowly reviews . . . whether that discretion was arbitrarily or capriciously exercised[.]"), *aff'd,* 217 F.3d 850 (Fed. Cir. 1999)); *Thomas Creek Lumber & Log Co. v. United States*, 32 Fed. Cl. 787, 790 (1995) ("'a party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously'" (quoting *Pacific Far East Line,* 394 F.2d at 998 (1968))).[44]

Accordingly, HACS's allegations of arbitrary and capricious agency conduct, at a minimum, support HACS's claim for breach of the implied duty of good faith and fair dealing. *See* FAC at 10.[45] "[T]he implied covenant of good faith and fair dealing implies a duty on all parties to a contract which 'limits the manner in which a party who is vested with discretion under the contract may exercise it by requiring that party to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.'" *Barseback Kraft AB v. United States*, 36 Fed. Cl. 691, 705–06 (1996) (quoting *Abbott v. Amoco Oil Co.*, 619 N.E.2d 789, 795–96 (Ill. App. 1993)), *aff'd,* 121 F.3d 1475 (Fed. Cir. 1997); *see also RDA Constr. Corp. v. United States*, 132 Fed. Cl. 732, 777 (2017) (holding that "[t]he Government may breach this duty [of good faith and fair dealing] if it acts unreasonably under the circumstances"), *aff'd,* 739 F. App'x 644 (Fed. Cir. 2018); *Orange Cove Irr. Dist. v. United States*, 28 Fed. Cl. 790, 800–01 (1993) ("When one party has the authority to exercise discretion to determine an essential term of a contract, as here, the covenant of good faith and fair dealing requires that the exercise of that discretion be reasonable.").

---

[44] *See also Fort Sumter Tours, Inc. v. Babbitt*, 66 F.3d 1324, 1331 (4th Cir. 1995) (agency's unilateral change of rates charged under National Park concession contract governed by arbitrary and capricious standard); *Neal & Co. v. United States*, 36 Fed. Cl. 600, 631 (1996) ("A breach, by the Government, of [] its duty to exercise its discretion reasonably. . . will result in liability."), *aff'd,* 121 F.3d 683 (Fed. Cir. 1997); *County of Suffolk v. United States*, 26 Cl. Ct. 924, 926–27 (1992) (finding contract language giving agency the discretion to make critical factual determination under a contract compelled review under arbitrary and capricious standard).

[45] *See also* Pl. Resp. at 25 n.7 ("HACS uses the language 'arbitrary and capricious' as a descriptive means of stating HUD does not have a viable reason for breaching the ACC and failing to provide HACS with its annual contributions.").

### C.      The Government's Shifting Positions

Ralph Waldo Emerson, in his essay *Self-Reliance*,[46] famously remarked that "[a] foolish consistency is the hobgoblin of little minds," but he was not commenting on the "[t]he judicial estoppel doctrine[,] [which] protects the integrity of the judicial process by preventing a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding."  *Reynolds v. Comm'r*, 861 F.2d 469, 472–73 (6th Cir. 1988).  As the United States Court of Appeals for the Sixth Circuit explained in *Reynolds*:

> The purpose of the doctrine is to protect the courts "from the perversion of judicial machinery."  Courts have used a variety of metaphors to describe the doctrine, characterizing it as a rule against "playing 'fast and loose with the courts,'" "blowing hot and cold as the occasion demands," or "hav[ing] [one's] cake and eat[ing] it too[.]"

*Id.* (internal citations omitted) (quoting *Edwards v. Aetna Life Insurance Co.*, 690 F.2d 595, 599 (6th Cir. 1982), *Scarano v. Central R.R.*, 203 F.2d 510, 513 (3d Cir. 1953), *Allen v. Zurich Insurance Co.*, 667 F.2d 1162, 1167 n. 3 (4th Cir. 1982), and *Duplan Corp. v. Deering Milliken, Inc.*, 397 F. Supp. 1146, 1177 (D.S.C. 1974)).

Although the Court acknowledges that the doctrine cannot be applied to confer jurisdiction where none exists, we write at greater length here to demonstrate that the government's position in this case is a 180-degree about-face from what the government told the United States Court of Appeals for the Seventh Circuit (and apparently several district courts) regarding Tucker Act jurisdiction in similar ACC breach cases.  In rejecting the government's motion to dismiss in this case, and as explained below, this Court simply adopts the government's view before the Seventh Circuit, which, apparently, represents the considered and authoritative view of the Office of the Solicitor General.

In *Greenleaf Limited Partnership v. Illinois Housing Development Authority*, the district court considered claims based upon ACCs to which HUD and the Illinois Housing Development Authority ("IHDA"), a PHA, were parties.  2009 WL 449100 (N.D. Ill. Feb. 23, 2009).  This is what the government argued in moving to dismiss IHDA's claims against HUD:

> [A]s revealed by IHDA's allegations themselves, the true nature [o]f IHDA's third-party complaints are the allegations

---

[46] https://www.owleyes.org/text/self-reliance/read/self-reliance#.

> that HUD has breached the ACCs with IHDA, . . . contract
> claims for which money damages would be the remedy and
> *for which the Tucker Act, not the APA,* would provide a forum-
> specific waiver of sovereign immunity in the Court of Federal
> Claims.

Memorandum In Support of Secretary's Motion To Dismiss Third-Party Complaints,
ECF No. 30, at 7, *Greenleaf Limited Partnership v. Illinois Housing Development Authority*,
2009 WL 449100 (N.D. Ill. Feb. 23, 2009) (No. 08-C-2480) (Sept. 29, 2008) ("IHDA Mem.")
(emphasis added).  Indeed, the government cited *Portsmouth Redev. & Hous. Auth. v.
Pierce*, 706 F.2d 471, 473–75 (4th Cir. 1983), for the proposition "that the Tucker Act vests
*exclusive jurisdiction* in the Court of Federal Claims over claims arising out of an ACC."
IHDA Mem. at 7 (emphasis added).[47]

Although the government now asserts that HACS's claims should have been
brought in the district court pursuant to the APA, that is not what the government
asserted in *Greenleaf*, where the government argued that claims against HUD based
upon the ACC, although "cast[] . . . as 'Administrative Procedure Act,' [claims] . . . are,
in reality, claims for money."  *Id.* at 6-7.  The government explained to the district court
that "[t]he Seventh Circuit—and every other Circuit Court of Appeals to address the
issue—has concluded that, for claims arising out of contracts, the Tucker Act *impliedly
forbids the district courts from exercising jurisdiction* over requests for money damages as
well as for injunctions, specific performance, or other equitable relief under the APA."
*Id.* at 8 (emphasis added) (citing cases and arguing that "IHDA's APA claims arise out
of government contracts and, therefore, should be dismissed").

But the government in *Greenleaf* did not stop there:

> In addition, IHDA cannot seek judicial review of agency
> action in a district court under the APA, because IHDA has
> an adequate alternative remedy.  5 U.S.C. § 704 ("[F]inal
> agency action *for which there is no other adequate remedy in a
> court* [is] subject to judicial review." (emphasis added)).
> Because the true nature of IHDA's claims are alleged breaches
> of contracts, IHDA may bring an action for money damages

---

[47] *See also Vill. W. Assocs. v. Rhode Island Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d 134, 137
(D.R.I.) (noting that "HUD's motion rests on the premise that [the] impleader action is a run-of-
the-mill contract claim against the United States" and that "at bottom [plaintiff] seeks money
damages through a complaint grounded upon rights that spring from the ACC contract" and
"[t]hus, the action falls within the Tucker Act, 28 U.S.C. § 1491, and the *exclusive* forum is the
United States Court of Federal Claims").

> in the Court of Federal Claims under the Tucker Act.  *See* 28
> U.S.C.  § 1491(a)(1). . . .  Not only does the availability of
> breach-of-contract actions provide an adequate alternative
> remedy to IHDA's APA claims, prevailing in that action
> would provide IHDA with the very remedy that it seeks in its
> APA claims: money damages for HUD's alleged failure to
> ***provide contributions*** to IHDA for rent adjustments to which
> plaintiffs allegedly were entitled.   Accordingly, because
> IHDA can bring breach-of-contract actions under the Tucker
> Act in the Court of Federal Claims, the APA's waiver of
> sovereign immunity is inapplicable.

*Id.* at 10 (emphasis added) (internal citations and footnote omitted) (citing *Suburban Mortgage Assocs.*, 480 F.3d at 1126–27).  Thus, just like HACS in this case, IHDA (a PHA) sought "contributions" to which it alleged entitlement.  The government even told the district court — correctly, in this Court's view — that "*res judicata* principles address any concerns about obtaining prospective relief from potential future rent adjustment disputes with HUD."  IHDA Mem. at 10 n.4 (citing *Consol. Edison Co. of N.Y., Inc. v. U.S. Dep't of Energy*, 247 F.3d 1378, 1384–85 (Fed. Cir. 2001)).

Regarding the Supreme Court's decision in *Bowen*, this Court's view, *supra*, is identical to the government's position in *Greenleaf*:

> A suit under the Tucker Act is presumptively an adequate
> remedy barring relief under the APA.  *See Suburban Mortgage
> Assocs.*, 480 F.3d at 1126.  *Bowen v. Massachusetts*, 487 U.S. 879
> (1988), did not reverse this presumption; rather, the *Bowen*
> Court focused on *the unique circumstances* presented in that
> case, involving review of a disallowance decision made by the
> Secretary of Health, Education, and Welfare *in administering
> the Medicaid program*.

Reply Memorandum In Support of Secretary's Motion To Dismiss Third-Party Complaints, ECF No. 35, at 5, *Greenleaf Limited Partnership v. Illinois Housing Development Authority*, 2009 WL 449100 (N.D. Ill. Feb. 23, 2009) (No. 08-C-2480) (Oct. 24, 2008) ("IHDA Rep. Mem.") (emphasis added) (concluding that "the Court of Federal Claims undoubtedly has jurisdiction over claims arising out of a contract").  Then, there is this nugget from the government's brief before the district court regarding the ACCs and *Bowen*:

> . . . *Bowen* involved questions of the scope of the Medicaid
> program, which is governed by statute and run by the states

> with discretion as to structure and administration. *Bowen*, 487
> U.S. at 883-87; *see also Suburban Mortgage Assocs.*, 480 F.3d at
> 1127 ("[N]owhere in *Bowen* did the Court make reference to
> the existence of any specific contract or express agreement
> defining the relationship between the parties."). In contrast,
> IHDA's contract claims relate only to the calculation of rents
> and HUD's *contributions, with payments made at specific times
> according to a specific formula*.

*Id.* at 6 (footnote omitted) (emphasis added) & n. 2 ("The dispute in this action is over
what terms are to be used in that formula. Such a dispute is nothing like the dispute in
*Bowen* over the proper scope of the Medicaid program as set forth in that program's
governing statutes.").

The district court in *Greenleaf* agreed with the government, holding that the "only
source of rights upon which IHDA has based its claim are the ACCs and the only
remedies it has sought are for breaches of contract. That the actions complained of may
be statutory or administrative in nature is immaterial; IHDA alleges only that HUD's
actions violated its contract rights." *Greenleaf*, 2009 WL 449100, at *5–6 (concluding that
"IHDA's claims are in substance contract-based action asking for monetary relief from
HUD"). Distinguishing *Bowen* on the very grounds proposed by the government, the
district court in *Greenleaf* further concluded that, in contrast to the Medicaid program
relationship between the federal and state governments at issue in *Bowen*, "the
relationship between [the PHA] and HUD involves a fixed contract and a fixed series of
payments over time relating only to the calculation of rents *and HUD's contributions*."
*Id.* at *7 (emphasis added) (noting that "nowhere in *Bowen* did the Court make reference
to the existence of any specific contract defining the relationship between the parties.").
HUD's failure to pay contributions to HACS is the primary issue in this case, as well.

In *Greenleaf*, the district court also held that "[t]he gravamen of IHDA's claims is
that HUD cannot modify its contractual obligation to pay IHDA for rent adjustments to
which Plaintiffs may allegedly be entitled by unilaterally altering the terms of the ACC"
and that "[t]he answer to this issue depends on whether Congress intended to authorize
the Secretary to modify existing ACCs by incorporating the new provisions of § 1437f[],
and, if this was its intention, whether the modification infringes any of IHDA's
protected [contract] interests." *Id.*[48] This, too, is very nearly the same as HACS's claims
in this case: whether HUD's actions, in withholding certain contributions, violated

---

[48] *Greenleaf*, 2009 WL 449100, at *8 (holding that a Court of Federal Claims' judgment pursuant
to the Tucker Act would "also provide relief for [IHDA's] prospective claims" based upon "*res
judicata* principles").

HACS's protected contract interests pursuant to the ACC.  The comparison is particularly apt given that the government in the instant case relies upon regulatory provisions apparently promulgated *after* the parties executed the HACS ACC (just like the statutory provision at issue in *Greenleaf*).[49]

Having located *Greenleaf* (and other similar decisions) prior to the June 24, 2020 oral argument on the government's motion to dismiss the FAC, this Court issued an Order, instructing the parties to be prepared to discuss a number of issues, including:

> whether the government's position in this case – with regard to Tucker Act jurisdiction – is consistent with HUD's position before various U.S. District Courts.  *See, e.g., Greenleaf Ltd. P'ship v. Illinois Hous. Dev. Auth.*, 2009 WL 449100, at *6–8 (N.D. Ill. Feb. 23, 2009); *Vill. W. Assocs. v. Rhode Island Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d 134, 137 (D.R.I. 2009) ("HUD's motion rests on the premise that [the] impleader action is a run-of-the-mill contract claim against the United States.  It claims that though [the complaint is] conveniently couched as seeking injunctive and declaratory relief, at bottom [it] seeks money damages  grounded upon rights that spring from the ACC contract.  Thus, the action falls within the Tucker Act, 28 U.S.C. § 1491, and the exclusive forum is the United States Court of Federal Claims[.]").

ECF No. 27 at 2.

Then, during oral argument, the Court and counsel for the United States had the following exchange on the subject:

> THE COURT:  Explain to me those District Court cases in which the Government sought to have them transferred or dismissed from District Court because they were really Tucker Act claims, the ones that were in my order from late last week.
>
> [DEFENDANT'S COUNSEL]:  Yes, Your Honor.  And actually . . . about three years after those decisions, **the Government confessed error in those cases**, specifically in *Greenleaf* on appeal to the Seventh Circuit.  And this is [the]

---

[49] *See* 24 CFR § 85.1(a) ("Federal awards with State, local and Indian tribal governments are subject to the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards at 2 CFR part 200.") (cited in Def. Mot. at 8).

> docket [number] – I don't think there was a published
> opinion, but [it is] Seventh Circuit docket 11-1753[.]
>
> …
>
> THE COURT:  Okay.  I'll pull it.  So now, the consistent
> position of the United States Government is that ACC claims
> belong in District Court.
>
> [DEFENDANT'S COUNSEL]:  Yes, Your Honor.  I mean, to
> be fair, those were Title -- or Section 8 claims. . . . [T]he
> confession of error is consistent with the position in this case,
> yes.

Tr. 65:9–66:9 (emphasis added).[50]

While the government characterized its "confessed error" as harmonizing its
position in this case with the government's view in the district court cases, that is
incorrect.  The government most assuredly did *not* confess error before the Seventh
Circuit regarding the government's view of the PHA's ACC claims, the applicability of
the Tucker Act, the APA, or *Bowen*.  Rather, *all* the government did was acknowledge
that the district court possessed *concurrent* jurisdiction, with the Court of Federal
Claims, based upon an alternative waiver of sovereign immunity adequately covering
***contract claims*** against HUD:

> After further consideration, . . . the government has
> concluded that its prior view is legally erroneous, and the
> Solicitor General has accordingly determined that the
> government should confess error.  As explained below, the
> sue-and-be-sued clause of the United States Housing Act, 42
> U.S.C. § 1404a, expressly waives the United States' sovereign
> immunity for all suits "with respect to [HUD's] functions
> under the United States Housing Act of 1937."  By its terms,
> that waiver applies to ***the breach-of-contract claims*** at issue
> here.

---

[50] Although the government repeatedly referred to *Greenleaf* and other decisions as "Section 8
cases," Tr. 94:15-95:6, the PHA's claims against HUD were based on an ACC.  *See Greenleaf*, 2009
WL 449100, at *5 ("The only source of rights upon which IHDA has based its claim are the
ACCs and the only remedies it has sought are for breaches of contract."); *see also* Tr. 20:13-14
("[DEFENDANT'S COUNSEL]:  HACS has said [that] the breach is of Part 3 of the ACC
itself[.]"), 44:10-12 ("[DEFENDANT'S COUNSEL]:  They're looking for money damages in the
amount that is owed pursuant to HUD's obligations under the ACC[.]").

Brief For Federal Third-Party Defendant/Appellee, ECF No. 23 at 7, *Greenleaf Limited Partnership v. Illinois Housing Development,* 2012 WL 1226060, at *7 (7th Cir. Apr. 2, 2012) (No. 11-1753) ("IHDA Seventh Cir. Br.") (emphasis added); *see id.* at 10 ("The government has now concluded that this interpretation of § 1404a is incorrect, and the Solicitor General accordingly has determined that the government should confess error.").[51]  Significantly, the government continued to describe the PHA's claims as "breach of contract claims."  *Id.* at 7.

Moreover — and for whatever reason, the government failed to mention this during oral argument — the government *expressly* argued to the Seventh Circuit that the district court's jurisdiction was *not* exclusive, but rather was concurrent with the Court of Federal Claims:

> The Tucker Act does not confer exclusive jurisdiction over the contract claims at issue here in the Court of Federal Claims. The Supreme Court made clear in *Bowen v. Massachusetts*, 487 U.S. 879, 910 n.48 (1988), that the Court of Federal Claims' jurisdiction "is 'exclusive' only to the extent that Congress has not granted any other court authority to hear the claims that may be decided by the Claims Court."  Here, the district court has subject-matter jurisdiction to hear IHDA's claims under 28 U.S.C. § 1331 and 42 U.S.C. § 1404a waives sovereign immunity.

*Id.* at 9 n.3.  Indeed, the government continued to press its view that, even pursuant to HUD's sue-and-be-sued clause, 42 U.S.C. § 1404a, APA jurisdiction would *not* be proper in the district court precisely *because of the availability of Tucker Act jurisdiction*:

> [T]he parties are in agreement that there is no need for this Court to address IHDA's separate argument regarding the waiver of sovereign immunity under the APA, 5 U.S.C. § 702. *See* IHDA Br. at 18 n.10.  Should the Court reach the question, however, it should affirm the district court's ruling that the APA does not provide an applicable waiver of the government's sovereign immunity in this context.  As IHDA acknowledges, this Court has held that "the Tucker Act impliedly forbids injunctive or equitable relief under the

---

[51] *Role of the Solicitor Gen.*, 1 U.S. Op. Off. Legal Counsel 228, 231, 234 (1977) (explaining that one role of the Solicitor General is that she or he "must coordinate conflicting views within the executive branch" and that "[o]nce the Solicitor General has taken a position with respect to a pending case, that position will, in most cases, become the Government's position as a matter of course").

> Administrative Procedure Act based on a contract with the United States." *Id.* at 19 (citing *Wabash Valley Power Ass'n v. Rural Electrification Admin.*, 903 F.2d 445, 452 (7th Cir. 1990)). IHDA attempts to avoid this well-settled rule by characterizing one of its claims as arising "under the Administrative Procedure Act." *Ibid.* Even that claim, however, is one that is unmistakably a claim for breach of contract.

IHDA Seventh Cir. Br. at 15.

The Seventh Circuit accepted the government's concession in *Greenleaf*, recognizing that "the waiver, by its terms, applies to the *breach of contract claims at issue* here." *Greenleaf Ltd. P'ship v. Ill. Hous. Dev. Auth.*, No. 11–1753, slip op. at 2 (7th Cir. Oct. 29, 2012) (emphasis added).[52] Thus, if anything, the government's confession of error before the Seventh Circuit supports HACS's position in this case, and patently is inconsistent with the government's position. Although this Court cannot apply judicial estoppel here,[53] this Court, like the Seventh Circuit, accepts the government's position

---

[52] Consistent with the government's argument to the Seventh Circuit in *Greenleaf*, various district courts have agreed that they possess *concurrent* jurisdiction with this Court's Tucker Act jurisdiction to decide ACC-based, **breach of contract claims** against HUD. *See, e.g., Gloucester Twp. Hous. Auth. v. Franklin Square Assocs.*, 2013 WL 3990820 at *4 (D.N.J. Aug. 2, 2013) ("[T]he Tucker Act does not grant the Court of Federal Claims exclusive jurisdiction over *federal contract claims*" so long as there is an independent "statutory waiver of the agency's sovereign immunity . . . and a statutory grant of subject matter jurisdiction" (emphasis added)); *Cathedral Square Partners Ltd. P'ship v. S. Dakota Hous. Dev. Auth.*, 875 F. Supp. 2d 952, 961 (D.S.D. 2012) (explaining that "[i]n HUD's brief before the Seventh Circuit Court of Appeals in *Greenleaf* . . . , HUD conceded error in its prior view that the sue-and-be-sued clause of 42 U.S.C. § 1404a did not waive HUD's sovereign immunity in a *breach of contract case*" (emphasis added)). The critical point is that these decisions – based on the government's own view – have considered claims for breach of an ACC as *contract claims* pursuant to an independent waiver of sovereign immunity, and not as APA claims. *See Gloucester Twp. Hous. Auth.*, 2013 WL 3990820 at *5 (citing *Greenleaf Ltd. P'ship v. Ill. Hous. Dev. Auth.*, No. 11–1753, slip op. at 2 (7th Cir. Oct. 29, 2012), for the proposition that "[s]ince HUD entered into the ACC contract with [the PHA] as part of its functions under Section 8, Congress has waived HUD's sovereign immunity *with respect to the contract*" (emphasis added)); *Vill. W. Assocs.*, 618 F. Supp. 2d at 138 (noting plaintiff "seeks . . . monetary relief based on obligations found in [an] ACC contract with HUD").

[53] "Judicial estoppel applies equally against the Government as it does private parties." *Agility Pub. Warehousing Co., K.S.C.P. v. United States*, 143 Fed. Cl. 157, 172 (2019) (citing *Cuyahoga Metro. Hous. Auth. v. United States*, 65 Fed. Cl. 534, 554–57 (2005). That said, judicial estoppel cannot confer jurisdiction where none exists. *See Lummi Tribe*, 788 F. App'x at 724; *Palafox St. Assocs., L.P. v. United States*, 114 Fed. Cl. 773, 785 (2014); *but see Christianson v. Colt Indus.*

as articulated before *that* court regarding the nature of the breach of contract claims at issue here – based, as they also are, upon the ACC – as well as the inapplicability of the APA to such claims.

The government has not adequately explained its evolving views of Tucker Act jurisdiction; the government's position in this case is all but impossible to reconcile with the details of the confession of error brief filed in the Seventh Circuit.  This is not the first time this Court (or the Federal Circuit, for that matter) has been critical of the government's ad-hoc approach to jurisdictional issues.  *Lummi Tribe*, 870 F.3d at 1319–20 (criticizing the "government's two faces," noting "severe misgivings about the incongruency of its stances in this and related litigation[,]" and explaining that "the government has taken, essentially, the opposite position in at least one of our sister circuits in parallel litigation"); *NCMS*, 114 F.3d at 199 ("This proposed scenario threatens to turn this case into a jurisprudential Flying Dutchman, casting about in search of a court that can reach the merits of [plaintiff's] claims."); *Mata v. United States*, 107 Fed. Cl. 618, 624 (2012) (criticizing a "whipsaw litigation strategy" and noting that "the Department of Justice functions as a unified entity for the United States Government"); *Palafox St. Assocs.*, 114 Fed. Cl. at 785 n.5.

Even though judicial estoppel is not applicable *per se*, the doctrine's "focus" — preventing "the perversion of the judicial process resulting from adopting inconsistent legal positions — applies with equal force in the jurisdictional context.  *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1345 (Fed. Cir. 2001); *see Data Gen'l Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996) ("Judicial estoppel is designed to prevent the perversion of the judicial process and, as such, is intended to protect the courts rather than the litigants."); *Jackson v. WellSpan Health*, 2014 WL 414251, at *5–6 (M.D. Pa. Feb. 4, 2014) (relying upon Third Circuit precedent to conclude that "[t]he doctrine of judicial estoppel is premised upon the inherent power of the court to punish misfeasance by parties[,]" and noting that "application of judicial estoppel entails an assessment of a party's bad faith").[54]

---

*Operating Corp.*, 486 U.S. 800, 818–19 (1988) (criticizing the "game of jurisdictional ping-pong" and holding that "[u]nder law-of-the-case principles, if the transferee court can find the transfer decision plausible, its jurisdictional inquiry is at an end"); *U.S. Marine, Inc. v. United States*, 722 F.3d 1360, 1373 (Fed. Cir. 2013) ("this court's action in now adopting the government's argument and affirming the transfer order, which depends on the Claims Court's having jurisdiction, establishes that [] right, as a matter of binding precedent and judicial estoppel").

[54] *See also Jackson*, 2014 WL 414251, at *1 ("In order to promote consistent candor in litigation, judicial estoppel permits courts to sanction parties who adopt irreconcilably inconsistent positions in litigation by precluding them from pursuing claims that are wholly inconsistent with the positions they have previously taken in some other lawsuit."); *Elan Microelectronics Corp. v. Pixcir Microelectronics Co.*, 2013 WL 4499006, at *7 (D. Nev. Aug. 14, 2013) (sanctioning

Particularly because the Court gave the government fair warning about the Court's interest in understanding the government's position in *Greenleaf* (and similar district court cases), *see* ECF No. 27 at 2, the Court rejects the government's fractional explanation provided during oral argument.  The Court nevertheless will provide the government yet another chance to explain itself.  At some point, however, this Court (or the Federal Circuit) will have to do more than simply issue critiques or admonishments, particularly when plaintiffs are made the subject of actual or attempted "jurisdictional ping pong."  486 U.S. at 818–19.

In light of the above, and consistent with the government's position before the Seventh Circuit, the government's motion to dismiss the FAC for lack of jurisdiction is **DENIED.**

### D.    The FAC States A Claim Upon Which Relief Can Be Granted

The government, in its motion to dismiss, focuses on isolated snippets of the FAC to argue that HACS has failed to meet RCFC 12(b)(6) pleading requirements, but simultaneously urges the Court to "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Def. Mot. at 13.  When viewed in its entirety — and in light of the contractual and other documents that the government itself has submitted for the Court's review — the FAC easily survives the government's motion to dismiss for failure to state a claim.

As explained above, HACS's breach of contract claim is straightforward, and is succinctly summarized in HACS's response brief, as follows:

> [1] The ACC is a valid and binding agreement between the parties.  [2] HUD is obligated under the ACC to provide funding to HACS.  [3] HUD breached that obligation by failing to pay HACS for over two years despite HACS continued compliance.  [4] HACS has suffered damages as a result of HUD's breach.

---

party for its failure "to candidly acknowledge its change in position and attempts to dance around and ignore the inconsistent positions it has taken" and describing such behavior as "violations of its duty of candor to the court and opposing counsel"); *Scarano*, 203 F.2d at 512–13 ("use of inconsistent positions would most flagrantly exemplify that playing fast and loose with the courts which has been emphasized as an evil the courts should not tolerate" (internal quotes omitted)).

Pl. Resp. at 25; *see id.* at 24 (arguing that "HUD is obligated under the ACC to provide funding to HACS[,]" but "has failed to do so for over two years").

The Court is not entirely sure why the government believes those allegations — which are fleshed out in greater detail in the FAC and the various documents the parties filed in support of their respective positions — flunk the RCFC 12(b)(6) pleading standard. Critically, the government only challenges the legal conclusion that HUD committed a breach in withholding the funds. Indeed, the Court views *that* as the critical issue in this case, *i.e.*, whether HUD's withholding of the sums to which HACS claims entitlement constitutes breach of the ACC or whether HUD, instead, has a contractual justification for withholding such sums.[55] In fact, during oral argument, the government all but conceded that, under the ACC, the government is obligated to pay HACS an annual contribution. *See* Tr. 14:10-14:15 ("[DEFENDANT'S COUNSEL]: [T]he first step in this process is that there's a fairly crisp mathematical calculation done to determine how much a given PHA is *entitled* for an annual -- *for the year*. It's broken into 12 pieces and those are the monthly portions and then those are allocated for the use of the PHA." (emphasis added)). Given this admitted obligation and HACS's claim that HUD failed to make those obligatory payments, the Court is convinced that the FAC states a plausible claim for monetary relief. In sum, then, the Court agrees with HACS that, in general, "[t]here is no question that HUD owes a [contractual] duty to provide HACS its annual contributions" because "[t]his is the purpose of the ACC." Pl. Resp. at 24.

The government's primary arguments for dismissal for failure to state a claim are that: (1) "the actions HUD took were expressly authorized by the ACC, statute, and applicable regulations"; and (2) "HACS failed to identify with specificity a violation of any provision of the ACC that would give rise to a breach of contract claim." Def. Rep. at 1. The government is all over the map. In arguing that HUD's withholding of the sums at issue was authorized, the government necessarily would have to concede that, if the government lacked such authorization pursuant to the HACS ACC, the result would be a breach of contract.

With regard to whether HACS has identified a violation of the HACS ACC with sufficient specificity, the Court concludes that HACS's reliance upon Section 3 of the contract is adequate to satisfy Rule 12(b)(6) standards. The HACS ACC itself suggests as much since, as explained above, Section 3 of the parties' contract provides that "HUD *shall* provide annual contributions to the [P]HA in accordance with all applicable

---

[55] Or, if the ACC provided HUD with some amount of discretion to withhold the funds, did the agency exercise its discretion reasonably or did HUD act in an arbitrary and capricious fashion, thus (possibly) violating the implied duty of good faith and fair dealing inherent in every contract, including the parties' ACC.

statutes, executive orders, regulations, and this ACC."  ECF No. 20-1, at 2 (HACS ACC, Part A, § 3) (emphasis added); *see* FAC ¶¶ 5–6, 19–20.  The government contends that this ACC provision "only states a truism," relying upon this court's decision in *PHADA*, 130 Fed. Cl. at 536.  Def. Mot. at 30.  Defendant is correct that *PHADA* characterized the final sentence of HACS ACC § 3 as "simply recit[ing] a truism[,]" 130 Fed. Cl. at 534, but the government takes that snippet entirely out of context.

In that part of the *PHADA* decision, Judge Kaplan addressed the *government's* argument that "HUD's failure to comply with Title 24 did not constitute a breach of contract because the ACCs contemplated that their terms were subject to both existing and future applicable laws, including the 2012 Appropriations Act."  *Id.*  Judge Kaplan rejected the government's argument, holding that the "ACCs contain no express statement of intent to incorporate by reference into the contract any statutory provisions that might be enacted in the future, or even any statute in existence at the time of the contracts' executions."  *Id.*  Thus, in *PHADA*, the government relied upon the very same language HACS does here, but for a different purpose — to argue that the terms of the 2012 Appropriations Act were incorporated into the ACC by reference.  *See* Defendant's Motion to Dismiss and Cross-Motion for Summary Judgment at 14 (ECF No. 41 at 20), *Pub. Hous. Authorities Directors Ass'n v. United States,* 130 Fed. Cl. 522 (2017) (No. 13-00006) (Feb. 12, 2016) (arguing that "the ACCs require compliance with statutes and regulations").  Notably, the entire premise of the government's argument in that case was that HUD *is* obligated to pay a housing authority various sums under an ACC, but that HUD *had* paid correctly the plaintiffs in that case.  The government does not demonstrate in its motion to dismiss that it correctly has paid HACS as a matter of law.

In any event, the government's reliance upon *PHADA* here is puzzling given that:  (1) the government did not contest, in *PHADA*, this Court's jurisdiction to decide a breach of contract claim based upon the ACC and the Tucker Act;  and (2) Judge Kaplan specifically concluded that while the housing authority plaintiffs in *PHADA* "did not bargain for the right to have HUD employ a particular methodology for determining their operating subsidy payments in the event of a budget shortfall[,] . . . they did bargain for the right to require HUD to use whatever methodology was set forth in the regulations at Title 24 of the C.F.R., as amended from time to time."  130 Fed. Cl. at 533.[56]  Indeed, Judge Kaplan explained the basic purpose of the ACC (and its statutory framework) as follows:

---

[56] *See also* 130 Fed. Cl. at 532 ("These express statements of intent that HUD's Title 24 regulations, as amended, are incorporated into the contract, are sufficient to establish that the parties undertook a contractual obligation to comply with the terms of those regulations. Indeed, the government does not argue otherwise.  The Court turns, therefore, to the question

> The Housing Act requires that "the provisions for [ ] annual contributions" made to PHAs be embodied "in a contract *guaranteeing their payment*." 42 U.S.C. § 1437c(a)(1); *see also* 24 C.F.R. § 990.115 (defining an ACC as "a contract prescribed by HUD for loans and contributions, which may be in the form of [an] operating subsidy, whereby HUD agrees to provide financial assistance and the PHA agrees to comply with HUD requirements for the development and operation of its public housing projects"). Accordingly, each of the PHA plaintiffs in this case is a party to an ACC with HUD that outlines the terms and conditions *pursuant to which they are entitled to receive operating subsidies*.

*PHADA*, 130 Fed. Cl. at 526–27 (emphasis added) (quoting ACC § 3 for the proposition that "[t]he contracts further *require HUD to provide annual contributions* to the PHAs 'in accordance with all applicable statutes, executive orders, regulations, and this ACC'" (emphasis added)).

Once again, HACS's claim, as alleged in the FAC, is simple: the HACS ACC "guarantee[s] . . . payment" of certain funds to HACS, *see PHADA*, 130 Fed. Cl. at 526–27 (discussing 42 U.S.C. § 1437c(a)(1)), such funds were allocated to HACS (presumably as part of the annual budgeting process described in the ACC), but HUD has prevented HACS, improperly and without basis, from actually utilizing those funds. FAC ¶¶ 21, 25; Pl. Resp. at 24–25. In that regard, HACS certainly has alleged sufficient facts plausibly demonstrating that HUD had no basis to deny HACS the sums it seeks and to which it is entitled. If HACS can prove the allegations in its FAC — or if HUD cannot explain the legal and factual basis for the withholding of funds that otherwise should have been paid — HACS will have shown a breach of contract or, at the very least, a breach of the implied duty of good faith and fair dealing.[57]

---

of *whether HUD violated that contractual obligation* in its allocation of operating subsidies to Plaintiffs in 2012." (emphasis added)).

[57] Tr. 24:22-25:1 ("[DEFENDANT'S COUNSEL]: Your Honor, to the extent that you are looking for, you know, a regulation or term that says, you know, HUD can act with absolute discretion, you know, unreasonably if it chooses, obviously, there isn't something like that."); Tr. 36:5-36:12 ("[DEFENDANT'S COUNSEL]: . . . I mean, ultimately, the question is you unreasonably exercised the, you know, statutory or regulatory actions. You know, obviously, there isn't a regulation out there in this framework of 2 CFR, 24 CFR, that says HUD can act with impunity to do whatever it wants regardless of reasonableness or arbitrariness.").

With that in mind, the Court turns to the government's second argument in support of its RCFC 12(b)(6) motion:  that HUD's actions, in withholding HACS's funds, "were expressly authorized."  Def. Rep. at 1.  In that regard, the government criticizes the FAC for "offer[ing] no facts explaining . . . nor any reference to the ACC or applicable statute that would support its assertion that HUD had no grounds to place HACS on zero-dollar threshold."  Def. Mot. at 32.  But how is HACS supposed to allege facts "proving a negative, a logical impossibility"?  *DJ Mfg. Corp. v. United States*, 33 Fed. Cl. 357, 359 (1995); *see Walther v. Sec'y of Health & Human Servs.*, 485 F.3d 1146, 1150 (Fed. Cir. 2007) ("our legal system rarely requires a party to prove a negative"); *Pecorell v. Sec'y of the Dep't of Health & Human Servs.*, 2008 WL 1903167, at *1 (Fed. Cl. Apr. 11, 2008) (acknowledging "the general principle that one cannot prove a negative").  The government asserts that "HUD has explicit authority to impose additional specific conditions on funds based on a PHA's performance[,]" but the government cites *no* authority whatsoever for that proposition.  Def. Mot. at 32.

The government further asserts that "HUD has the right to terminate, withhold, reduce, or order corrective actions on the availability of program funds to a PHA that fails to *substantially* comply with any provision of the public housing program or has a history of failing to comply with the terms of conditions of a Federal award, fails to meet performance goals, or is not otherwise responsible."  Def. Mot. at 33 (emphasis added) (citing ACC, statutory, and regulatory provisions).[58]  That assertion is problematic for at least two reasons.

The first problem with that broad assertion is that HACS has alleged *facts* that, taken as true at this stage, demonstrate that HACS has been, and is, in substantial compliance with ACC, statutory, and regulatory requirements.  FAC ¶¶ 11–13.  To the extent that HACS was the subject of adverse audit findings, HACS alleges it has cured any problem, and thus the agency has no basis to continue to withhold the funds HACS seeks.  *Id.*  If the government disagrees, that is a factual disagreement that must be resolved via summary judgment or at trial.  That HUD generally may have a "right, *pursuant to* the ACC and the incorporated regulatory framework, to place conditions on the receipt of PHA subsidies[,]" Def. Rep. at 8 (emphasis in original), does not demonstrate, as a matter of law, that such a contractual right properly was exercised in light of the FAC's alleged facts.

---

[58] As explained further below, the government at oral argument relied only upon provisions from 2 C.F.R., however – and abandoned the others cited in its motion.  Tr. 33:11-33:25.

The second problem with the government's assertion regarding its putative power to limit "the availability of programs funds" provided to HACS, Def. Mot. at 33, is that the government simply could not explain the mechanics of such withholding.[59] During oral argument, counsel of record for the government retreated to relying upon only 2 C.F.R. §§ 200.205, 200.207, and 200.338.[60] Putting aside the question of whether those regulatory provisions were incorporated into the HACS ACC,[61] the government was unable to justify HUD's particular actions with respect to HACS, and about which HACS complains in its FAC.

---

[59] For example, the government, in its motion, contends that "[t]hresholds may be set as low as 'zero-dollar,' thereby requiring HUD review of each requested draw down." Def. Mot. at 5. Conspicuously absent from this quote, from anywhere else in the government's motion, or from its oral argument, is any authority supporting the proposition that a so-called "zero-dollar threshold" exists – much less any explanation concerning how such a restriction operates, consistent with the regulations upon which the government primarily relied during oral argument.

[60] *See* Tr. 33:11-33:25. Although the government cited 24 C.F.R. § 905.804 ("Sanctions") in its motion to dismiss, Def. Mot. at 4 & 8, the government did not rely upon that provision at oral argument. That regulation provides that "[if] HUD finds that a PHA has failed to comply substantially with any provision [of] *this part*, HUD may impose one or a combination of sanctions, as it determines is necessary." 24 C.F.R. § 905.804(a) (emphasis added). Perhaps the government declined to defend that citation because HUD did not or cannot establish such a compliance failure at the motion to dismiss stage, or because the provision requires HUD to follow a specific appeals process "[*b*]*efore* taking any [such] action" but that did not occur. *Id.* § 905.804(b) (emphasis added). Either way, the citation raises more questions than it answers. The government also cited 24 C.F.R. § 907.7 in its motion to dismiss, *see* Def. Mot. at 8. But, that provision covers "[r]emedies for substantial default[.]" Thus, even assuming that the government had pressed this provision at oral argument, which it did not, and even assuming that HUD maintained that HACS was in "substantial default" here, which does not appear to be the case, that provision cannot be applied to achieve a dismissal as a matter of law at the motion to dismiss stage, given the facts alleged in the FAC. This extreme lack of clarity further demonstrates why discovery is warranted.

[61] The provisions from 2 C.F.R. upon which the government relies were issued ***after*** the parties executed the HACS ACC. While the HACS ACC "incorporates by reference in to this ACC those regulations issued by HUD *for the development, modernization, and operation* of public and Indian housing projects contained in Title 24 of the Code of Federal Regulations, as said Title shall be amended from time to time[,]" ECF No. 20-1 at 2 (HACS ACC, Part A, at 1) (emphasis added), the parties thus far appear to assume that the Title 2 C.F.R. provisions were incorporated into the HACS ACC via the amendment of Title 24 C.F.R. The Court proceeds on the same basis for the purposes of resolving the government's motion to dismiss, but is uncertain whether the government is correct about Title 2 C.F.R. *See PHADA*, 130 Fed. Cl. at 534-35.

For example, 2 C.F.R. § 200.205 primarily imposes obligations on a federal agency to conduct a "review of risk posed by [grant] applicants." That regulation further provides that a "prior Federal award recipient must demonstrate a satisfactory record of executing programs or activities under Federal grants, cooperative agreements, or procurement awards; and integrity and business ethics." 2 C.F.R. § 200.205(a)(2). In this case, however, the government does not dispute that the ACC *already has* been awarded — and the funds themselves allocated via the operating budget process. *See* Tr. 14:1-9 ("THE COURT: [§ 200.207] refers to pre-federal award requirements and contents of federal awards and looks like it has -- it gives the power to the Government to insert award conditions into the award itself, as opposed to imposing conditions on already-awarded funds. How do we get to already-awarded funds? [DEFENDANT'S COUNSEL]: Your Honor, I think -- in this case, I think we're -- the award is -- this is where the language gets a little nebulous, I suppose."); Tr. 27:9-25 ("THE COURT: [M]y understanding is that the money that's paid into LOCCS, at that point, the award has already been made. [DEFENDANT'S COUNSEL]: "[T]he amount has been allocated[.] . . . THE COURT: I think they've demonstrated that the award has been made already. They've already submitted an operating budget, correct, at that point, once the funds are in the LOCCS account? [DEFENDANT'S COUNSEL]: Yes, Your Honor.").

It is far from clear that § 200.205 addresses anything other than *pre*-award considerations and conditions that may be imposed at the time of an award. *Id.* § 200.205(b) ("If the Federal awarding agency determines that a Federal award *will be made*, special conditions that correspond to the degree of risk assessed may be applied to the Federal award. *Criteria to be evaluated must be described in the announcement of funding opportunity* described in § 200.203 Notices of funding opportunities." (emphasis added)); *id.* § 200.205(a)(2) ("The Federal awarding agency may make a Federal award to a recipient who does not fully meet these standards, if it is determined that the information is not relevant to the current Federal award *under consideration* or there are specific conditions that can appropriately mitigate the effects of the non-Federal entity's risk in accordance with § 200.207 Specific conditions." (emphasis added)). Section 200.207 is not particularly helpful to the government here either, as that provision appears to apply only *prior to* or as *part of* a specific award. *See* 2 C.F.R. § 200.207 ("Specific conditions."). Indeed, both §§ 200.205 and 200.207 are contained within 2 C.F.R. Subpart C - **Pre**-Federal Award Requirements and **Contents** of Federal Awards

(emphasis added).  These regulations provide no indication that HUD is empowered to sanction HACS *during* its performance of the already awarded ACC or to restrict the funds already allocated to HACS pursuant to the ACC and its budgeting process.[62]

The government's reliance upon 2 C.F.R. § 200.338 is an improvement, at least insofar as it covers "[r]emedies for noncompliance" *following* the award of an agreement, contained, as the provision is, within 2 C.F.R. Subpart D - *Post* Federal Award Requirements (emphasis added).  Thus, that provision at least *does* appear to permit a Federal agency to "impose additional conditions" specified in § 200.207, but only where a "non-Federal entity fails to comply with Federal statutes, regulations or the terms and conditions of a Federal award."  2 C.F.R. § 200.338.  During oral argument, however, the government could not identify even a single such triggering compliance failure on the part of HACS.[63]  Instead, the government relies solely upon a letter from HUD to HACS that the government submitted as Exhibit A in support of the motion to dismiss.  *See* ECF No. 22-1 (Aug. 3, 2017 Letter from Cheryl J. Williams, Director, Office of Public Housing, New Orleans Field Office, HUD to Sheila Danzey, Executive Director, HACS).  Nowhere in that letter, however, does HUD identify a single compliance violation of "Federal statutes, regulations, or the terms and conditions of a Federal award."  2 C.F.R. § 200.338.[64]

---

[62] Tr. 27:21–28:6 ("THE COURT:  I think they've demonstrated that the award has been made already.  They've already submitted an operating budget, correct, at that point, once the funds are in the LOCCS account?  [DEFENDANT'S COUNSEL]:  Yes, Your Honor.  THE COURT:  And the operating budget has been approved?  [DEFENDANT'S COUNSEL]:  I believe so.  THE COURT:  That's how the money winds up in the account in a particular amount.  [DEFENDANT'S COUNSEL]:  Yes.").

[63] Tr. 17:25-18:11 ("THE COURT:  [2 C.F.R. § 200.]338 says that HUD can impose additional conditions described in .207, as you just said, where a nonfederal entity fails to comply with statutes, regulations or the terms and conditions of the federal award.  So what statute, regulation or terms and conditions of an existing federal award did the Housing Authority fail to comply with?  [DEFENDANT'S COUNSEL]:  Your Honor, *to be perfectly frank, I'm not sure that I have gotten to that point yet because we haven't really delved into the merits of the complaint, beyond what is fairly generally, as I think you pointed out, contained in the letter*."  (emphasis added)).  That colloquy is a striking admission that (1) disputed facts are at issue here, and (2) the parties' disagreement cannot be resolved at this stage, as a matter of law.  Although the government referenced certain audit reports as possibly identifying such violations, the government did not point to any specific findings, and did not even "know [whether] they're attached to anything that we have [filed] yet."  Tr. 18:12-18:21 (the Court noting that at least some such audit reports had been attached in Exhibit B to the government's motion).  In any event, the FAC appears to challenge any agency conclusions or actions derived from the audit reports in question.

[64] In the August 3, 2017 letter, HUD mistakenly cites regulatory provisions contained in "Title 24 Code of Federal Regulations (CFR)."  The provisions HUD intended to reference actually are

Even if the government had been able to identify a putative HACS compliance failure sufficient to justify HUD's actions, that would merely beg the question the FAC fairly raises: whether the government had a factual predicate to support the imposition of "additional conditions" pursuant to 2 C.F.R. § 200.338; or, if the government had discretion to impose such conditions, whether it exercised such discretion consistent with the implied duty of good faith and fair dealing inherent in every contract.

With respect specifically to the zero-dollar threshold review process that HUD imposed on HACS — and about which HACS complains, *see* FAC ¶ 12 — the government relies upon 24 C.F.R. § 990.210(a). Although that regulation does permit HUD to establish certain "thresholds," it is entirely unclear what that term actually means as a practical matter. That is because the regulations, at the outset, appear to command payment to a housing authority in a particular manner: "HUD *shall* make monthly payments equal to 1/12 of a PHA's total annual operating subsidy under the formula by electronic funds transfers through HUD's automated disbursement system." *Id.* (emphasis added). The same regulation further provides that "HUD shall establish thresholds that permit PHAs to request monthly installments." *Id.* Nothing suggests that HUD may employ this regulation, however, to entirely preclude a housing authority from accessing payments that HUD otherwise is required to make.

The government asserts, without any supporting authority, that "[t]hresholds may be set as low as 'zero-dollar[.]'" *See* Def. Mot. at 5. Although 24 C.F.R. § 990.210(a) does indicate that "[r]equests by PHAs that exceed these thresholds will be subject to HUD review[,]" the regulation also provides that "HUD approvals of requests that exceed these thresholds are limited to PHAs that have an *unanticipated and immediate need for disbursement*." 24 C.F.R. § 990.210(a) (emphasis added). Read literally, however, the Court does not understand how an amount exceeding a threshold could ever be "unanticipated" if the total monthly subsidy is computed in advance via a formula. The government was unable to explain how all of this language actually works (or is supposed to work), and, a noted above, the government could not point to any HUD regulation (or even a manual or other sub-regulatory guidance) describing the agency's supposed power to impose, or the mechanics of, a zero-dollar threshold.[65] *See Use of*

---

in Title 2, specifically 2 C.F.R. §§ 200.207, 200.338. ECF No. 22-1, at 2.; *see* 15:14-16:3 (discussing the letter's error). Notably, the letter does not mention any of the other provisions the government cited in its motion but then declined to defend at oral argument. Def. Mot. at 4, 8.

[65] *E.g.,* Tr. 38:8-11, 21-25 ("[DEFENDANT'S COUNSEL]: So to be fair, Your Honor, I'm not entirely confident -- and I will say this, I'm not confident that operating subsidy is the same thing as operating fund. It may be. . . . THE COURT: So 990, the whole section, is operating fund. That doesn't cover capital fund. [DEFENDANT'S COUNSEL]: Yes, . . . I do not know what the breakdown is in terms of . . . what has been requested that has not been disbursed"); Tr. 39:6-12 (THE COURT: "[H]ow does it normally work with the request for monthly

*eLOCCS (electronic Line of Credit Control System) to Request Operating Subsidy Payments and Elimination of Form HUD-52721*, PIH 2002-28 (HA) (Dec. 24, 2002), at §§ 4.C – 4.E (describing process for "[e]stablishing the amount available for drawdown in LOCCS," noting that there may be a "Retained Disbursement" for "an amount owed HUD," and explaining that there are "two threshold edits . . . established to regulate the maximum drawdown amounts," including the "[p]er month calculated threshold" and the "[c]umulative calculated threshold[,]" but without any mention of a zero-dollar threshold option).[66]

Moreover, while 24 C.F.R. § 990.210 applies only to the "operating subsidy" or "operating fund,"[67] the restrictions HUD imposed upon HACS applied to both operating funds *and* capital funds.  ECF 22-1 at 2.  The government, however, has no idea what amounts were being withheld from HACS that fall into the operating, as opposed to the capital, funds category.[68]  How, then, can the government confidently assert that it is nevertheless empowered to impose a so-called "zero-dollar" threshold on *all* such funds?  *See* Def. Mot. at 5.

The government does not dispute that it is withholding funds from HACS.  That being the case, if the government is going to argue that the HACS's claims should be dismissed as a matter of law, prior to any discovery, the government should be able to walk the Court through — with a high-degree of precision — exactly what is being withheld, relating to what years, why, and pursuant to what contractual, statutory and/or regulatory authority.  The fact that the government at oral argument could not explain, in detail, how the HUD programs and the HACS ACC at issue are supposed to function, gives the Court little to no confidence in the government's arguments in favor of dismissal.  For example, consider this exchange during oral argument:

> THE COURT:  And this [regulation] just says, HUD shall establish thresholds that permit PHAs to request monthly installments.  I don't even understand how this normally

---

installments?  [DEFENDANT'S COUNSEL]:  Getting into the weeds, I'm not sure I am able to answer that question.").

[66] https://www.hud.gov/sites/documents/DOC_9306.pdf (last visited July 24, 2020).

[67] *See* 24 C.F.R. Subpart E - Determination and Payment of Operating Subsidy.

[68] Tr. 37:5-40:3 ("[DEFENDANT'S COUNSEL]:  Yeah, no, you're right, it is.  I do believe it is the operating fund amount.  THE COURT:  Okay.  [DEFENDANT'S COUNSEL]:  That this specifically is to operating fund.  THE COURT:  Right.  So 990, the whole section, is operating fund.  That doesn't cover capital fund.  [DEFENDANT'S COUNSEL]:  Yes, Your Honor.  And I do not know what the breakdown is in terms of what is being – what has been requested that has not been disbursed, to the extent that that is true.").

works.  I mean, normally, just your normal, run-of-the-mill situation, one-twelfth gets transferred. . . . [H]ow does it normally work with the request for monthly installments?

[DEFENDANT'S COUNSEL]:  When you say normally in terms of, you know, not in this situation?

THE COURT:  Correct.

[DEFENDANT'S COUNSEL]:  Getting into the weeds, I'm not sure I am able to answer that question.  I know it goes into -- that one-twelfth goes into the LOCCS system.

. . .

THE COURT:  I guess what I'm trying to understand is what is the difference between a threshold and the one-twelfth -- whatever the one-twelfth number is?

[DEFENDANT'S COUNSEL]:  I will be perfectly honest with Your Honor, I was going through that this morning and I am not sure.

Tr. 40:1-4.

Or, take this exchange with government counsel during oral argument:

[DEFENDANT'S COUNSEL]:  Well, we are in a very difficult situation from the one you described because, in this case, it's not a reimbursement.  These are funds that are intended to be used in a particular manner for particular activities, and pursuant to this regulatory scheme, a very complicated –

THE COURT:  It's 2016 and 2017.  It's done.  The years are done.  How can that be?  It's not prospective.

[DEFENDANT'S COUNSEL]:  I mean, perhaps that's another problem.

THE COURT:  Give me one example of the type of money that they want that the Government – you articulate HUD's position here for me, the United States' position that there's money in an account in 2016 that was deposited for operating and capital funds for which they now want money dating back to 2017 that they cannot get because they're out of

- 50 -

> compliance.  Just one example of one dollar of what it is and
> what they want and why they can't have it.  I don't get it.
>
> [DEFENDANT'S COUNSEL]:  And, Your Honor, *some of this*
> *goes to exactly how that disbursement process works that we haven't*
> *quite ironed out yet*.

Tr. 49:12-50:9 (emphasis added).

The government's motion to dismiss for failure to state a claim relies upon HUD's putative contractual powers.  How, then, can the government ask for a merits dismissal pursuant to RCFC 12(b)(6), but not be prepared to explain the mechanics of the Capital Fund and Operating Fund programs and the HACS ACC, their contemplated budgeting and payment processes, and HUD's contractual powers as they presumably were employed here?  That is not meant as a rhetorical question.  The answer is that the government should not have sought such a dismissal here without being able to address those questions in detail.  The government's motion to dismiss for failure to state a claim is **DENIED**.

Perhaps following some further research and discovery, the parties will be better positioned to explain the payment and withholding mechanics at issue in this case (*i.e.*, in a motion for summary judgment or at trial).  At this point, however, HACS has alleged sufficient facts in support of its claims that HUD improperly has withheld payments in violation of the HACS ACC.

\* \* \* \* \*

## *CONCLUSION*

For all of the foregoing reasons, the government's motion to dismiss is **DENIED**. The parties are directed to file a joint status report on or before **August 26, 2020**, proposing a schedule for discovery.

Furthermore, if the Justice Department's Commercial Litigation Branch, *after consulting with the Office of the Solicitor General* ("OSG"), in fact no longer stands by the latter's view of the Tucker Act and the APA – in the context of an alleged breach of an ACC – as articulated in the confession of error brief submitted to the Seventh Circuit in *Greenleaf*, the government may file a supplemental brief on or before **August 10, 2020**, not to exceed five (5) pages.  In that brief, the government shall explain the reason for its revised view, as well as how its new position fits with the government's representations at oral argument.

*Alternatively*, if the government believes that the *Greenleaf* ACC provisions and/or the claims at issue in that case are distinguishable – for *jurisdictional* purposes – from those at issue here, the government may file a supplemental brief on or before **August 10, 2020**, not to exceed five (5) pages, in which the government shall compare the various ACC provisions and claims.  Such supplemental brief shall include as attachments both the complaint against HUD in *Greenleaf*, as well as the operative ACC(s) in that case.

The government may file ***only one*** of the supplemental briefs specified above. To be clear, given the government's reliance upon the above-discussed Seventh Circuit briefing, the government – with respect to *either* optional supplemental brief – shall consult with, and include a representation that it has cleared its position with, the OSG.

If the government elects not to file either supplemental brief, the Court will understand that to mean that the government's current view is consistent with its position taken before the Seventh Circuit, and that such position, having been accepted by this Court as well, required the denial of the government's motion to dismiss for lack of jurisdiction here.

s/Matthew H. Solomson
Matthew H. Solomson
Judge